EXHIBIT J

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


CLARENCE BEAVER and JOSEPH
STILWELL,

               Plaintiffs,           CERTIFIED COPY

vs.                        Case No.
                             2:20-cv-00279-WBS-DB

COUNTY OF BUTTE, BUTTE
COUNTY SHERIFF'S OFFICE,
SHERIFF KORY L. HONEA in
his Individual Capacity,
DEPUTY PEREZ in his
Individual Capacity,
DEPUTY WAHLBERG in his
Individual Capacity,
SERGEANT J. BEHLKE in his
Individual Capacity,
CORRECTIONAL OFFICERS JOHN
DOE 1-10, WELLPATH, LLC,
CALIFORNIA FORENSIC
MEDICAL GROUP,

               Defendants.


DEPOSITION OF JASON BEHLKE

Thursday, October 28, 2021

Page 1 - 67      2:00 p.m. - 3:40 p.m.


1600 Humboldt Road, Suite 1

Chico, California


REPORTED BY:

Kaitlyn B. Houston

CSR No. 14170

DEPOSITION OF:  JASON BEHLKE

```
 1                    A P P E A R A N C E S:

 2


 3    For Plaintiffs:

 4        LAW OFFICES OF RON MARQUEZ
          BY:  RON MARQUEZ, ESQ.
 5        1280 E. 9th Street, Suite D
          Chico, California 95928
 6        (530) 332-8110

 7

 8    For Defendants:

 9        WASHINGTON & WASHINGTON
          BY:  PETER WASHINGTON, ESQ.
          1600 Humboldt Road, Suite 2
10        Chico, California 95928
          (530) 345-0821
11


12    For Defendants (appearing remotely):

13        THE LAW OFFICES OF JEROME M. VARANINI
          BY:  LINDA McCREARY, ESQ.
14        641 Fulton Avenue, Suite 200
          Sacramento, California 95825
15

16                       --o0o--

17

18

19

20

21

22

23

24

25
```

DEPOSITION OF:  JASON BEHLKE

```
 1                    INDEX OF EXAMINATIONS

 2    Examinations                                    Page

 3    MR. MARQUEZ.......................................   4

 4    MR. WASHINGTON....................................  54

 5    MR. MARQUEZ.......................................  58

 6

 7                        ---oOo---

 8

 9                    INDEX OF EXHIBITS

10    Number              Description                 Page

11    Exhibit 1      Butte County Sheriffs Office .........  24

12                   Document; 119 pages

13    Exhibit 4      Video................................  43

14    Exhibit 2      Butte County Sheriff's Office ........  60

15                   Interdepartmental Memorandum re:

16                   Joseph Stilwell; 1 page

17    Exhibit 3      Butte County Sheriff's Office ........  60

18                   Interdepartmental Memorandum re:

19                   Clarence Beaver; 1 page

20

21                        ---oOo---

22

23

24

25
```

EMERALD DEPOSITION REPORTERS  530.751.3885                    3

1                      CHICO, CALIFORNIA

2          THURSDAY, OCTOBER 28, 2021, 2:00 P.M.

3                       JASON BEHLKE,

4          having been first duly sworn, was examined

5                  and testified as follows:

6          **EXAMINATION BY MR. MARQUEZ**

7      Q.    Good afternoon, Sergeant.  My name is

8    Ron Marquez.  I'm the attorney for the plaintiffs,

9    Clarence Beaver and Joseph Stilwell, regarding an

10   incident from March 7, 2019, at the county jail.  We're

11   here to take your deposition.

12            Have you ever been deposed before?

13     A.    I have not, no.

14     Q.    Have you ever testified in court?

15     A.    I have, yes.

16     Q.    Approximately how many times have you testified

17   under oath?

18     A.    One time.

19     Q.    When was that?

20     A.    Approximately 2017.

21     Q.    Generally speaking, what was the nature of the

22   case that you testified on?

23     A.    I was working in the house arrest program, and

24   one of my case --

25            THE STENOGRAPHER:  I'm sorry.  "One of my" --

1          THE WITNESS:  Caseload cut his ankle monitor

2     off and escaped.

3     BY MR. MARQUEZ:

4          Q.   Okay.  So I'm going to go over a couple ground

5     rules, most of which you've probably already discussed.

6     But I'm going to go through them anyway, just to make

7     sure we're on the same page, all right?

8          A.   Okay.

9          Q.   The oath that you took is the same oath you

10    would take as if we were testifying in a court.

11         A.   Okay.

12         Q.   You understand that?

13         A.   Yes.

14         Q.   The court reporter is taking down everything

15    verbatim that's said in this room.  So we have got to

16    make sure that we verbalize all our answers.  Is that

17    understood?

18         A.   Yes.

19         Q.   So while it may be common to shake your head

20    for no or nod your head for yes, I might ask you to

21    verbalize an answer.  I'm not trying to be rude --

22         A.   Right.

23         Q.   -- just remind you that we're making a record.

24         A.   Okay.

25         Q.   Another rule is that only one person can talk

1    at a time.  Otherwise, it makes the transcript really

2    hard to read.  So I'm going to ask that you allow me to

3    finish my question completely before you start to

4    answer.  And, in turn, I'm going to let you finish your

5    response before I move on to the next question, okay?

6        A.   Understood.

7        Q.   If you don't understand any of my questions,

8    please let me know.  I'm not here to try to trick or

9    trap you or confuse you with my questions.  If you start

10   to answer, we'll all going to assume that you understood

11   the question.

12       A.   Okay.

13       Q.   From time to time, your attorney may make

14   objections.  I would just ask that you stop talking once

15   you hear him say "objection," and allow him to voice his

16   objection on the record.  And then I would ask you to go

17   ahead to proceed to answer the question, unless he

18   specifically directs you not to.

19       A.   Okay.

20       Q.   Have you consumed any alcohol or medications

21   or substances in the past 24 hours that would affect

22   your ability to testify?

23       A.   I have not.  No.

24       Q.   Is there any reason why we can't move forward

25   with your testimony today?

1      A.   Not that I'm aware of.  No.

2      Q.   In preparation for this deposition, have you

3   spoken to anybody besides your attorneys?

4      A.   No.

5      Q.   Did you speak to any of your superior officers

6   or any fellow coworkers at the jail about this

7   deposition?

8      A.   No.

9      Q.   In preparation for the deposition, did you

10  review any documents, records --

11     A.   I have.  Yes.

12     Q.   What did you review?

13     A.   I reviewed the incident report, the criminal

14  report that was authored by Deputy Yee, and also my

15  hospital transport memos.

16     Q.   So that was the incident report, criminal

17  report from Deputy Yee, and you said transport report,

18  as well?

19     A.   Correct.  Yeah.

20     Q.   Any other documents that you reviewed in

21  preparation for the deposition?

22     A.   No.

23     Q.   Approximately when did you last review those

24  documents?

25     A.   Approximately 30 days ago.  Before the first

1    deposition we were going to have that got cancelled.

2         Q.   Did you review any videos or pictures?

3         A.   I've watched the video before.  Once again,

4    it's probably been 30 days since I've watched it.

5         Q.   When you say "video," what video did you

6    review approximately 30 days ago?

7         A.   The video of this incident that took place.

8         Q.   Is it the surveillance footage from G pod from

9    March 7, 2019?

10        A.   Correct.  I believe so.

11        Q.   Besides the video, any other -- I'm sorry.

12   Besides the G pod video, any other videos or pictures

13   that you reviewed?

14        A.   No.

15        Q.   Who's your current employer?

16        A.   Butte County Sheriff's Office.

17        Q.   And what's your work address?

18        A.   7 Gillick Way, Oroville, California 95961.

19        Q.   When did you first work -- start working for

20   the jail?

21        A.   2/28 of '08.

22        Q.   When you were first hired in 2008, what was

23   your initial rank and position?

24        A.   Correctional deputy.

25        Q.   And have you received any promotions or rank

1  changes since then?

2      A.    Yes.   I was promoted correctional sergeant in

3  November 21st of 2015.

4      Q.    Any other promotions since 2015?

5      A.    No.

6      Q.    What are your current job duties?

7      A.    Basic supervision of the jail operations and

8  staff.

9      Q.    Approximately how many people do you supervise

10  or oversee?

11      A.    Approximately 20 on a daily basis, plus or

12  minus.

13      Q.    Is that throughout the jail, or are you a

14  certain area of the jail?

15      A.    Throughout the jail, depending on shift.

16      Q.    Which shift has more employees that you

17  supervise?

18      A.    Day shift has more employees that we

19  supervise.   Night shift has more responsibilities.

20      Q.    What additional responsibilities are there at

21  night shift that aren't during the day shift?

22      A.    Basically, you're acting as a watch commander,

23  and that incurs pretty much anything that happens in the

24  jail.

25      Q.    Are you responsible for supervising deputy

1    Esteban Perez?

2         A.   At times, yes.  So there's team rotations.

3    And he currently is on a special program, so -- not

4    currently, but I have in the past.  Yes.

5         Q.   Were you supervising him in March of 2019?

6         A.   Yes, I believe so.

7         Q.   During your employment with the jail, have you

8    ever been disciplined?

9         A.   No.

10        Q.   Have you ever been written up or reprimanded?

11        A.   No.  Never once.

12        Q.   On the days of March 6th and March 7th of

13   2019, what were your work hours?

14        A.   I believe they were 7:00 p.m. to 7:00 a.m.

15        Q.   Are you aware of the altercation that occurred

16   in G pod at approximately 3:00 a.m. between the

17   plaintiffs and defendants in this matter?

18        A.   I am.  Yes.

19        Q.   How did you first become aware of the

20   incident?

21        A.   I believe, from memory, that Deputy Perez

22   called it via radio for deputies to respond to

23   altercation in G pod.

24             MR. WASHINGTON:  And just to interject for the

25   record, I'm sure it was just a misstatement, but no

1    defendants in the action were involved in the

2    altercation.

3              MR. MARQUEZ:  Thank you for that

4    clarification.

5    BY MR. MARQUEZ:

6         Q.   To clarify, it would be between Mr. Beaver,

7    Mr. Stilwell, and Mr. Hernandez.

8              Do you recall where you were when you first

9    heard about the incident?

10        A.   I do not.  No.

11        Q.   When you first learned of the incident, you

12   heard it over the radio; is that correct?

13        A.   I believe so.  Yes.

14        Q.   And it was Deputy Perez who announced it over

15   the radio?

16        A.   I believe so.  Yeah.

17        Q.   After you heard it on the radio, what did you

18   do next?

19        A.   I responded to the G pod housing unit and

20   assessed the situation.

21        Q.   And were you the first person there, or had

22   other correctional officers --

23        A.   I don't recall, but I don't believe so.

24        Q.   Approximately how long after you heard the

25   call did you get to G pod?

1      A.    I would say probably less than 60 seconds.

2      Q.    When you first entered G pod on March 7, 2019,

3  in response to the call, what's the first thing that you

4  remember seeing?

5      A.    The lights were on, which were abnormal for

6  night shift, and there was obviously an incident in the

7  lower tier area of the housing unit.

8      Q.    So when you entered into G pod and -- and you

9  see what's going on, what do you do next?

10      A.    I respond to the scene, assess the situation,

11  saw there was clearly injuries, and secured the scene.

12  And -- and I don't recall if medical was present already

13  or not.  But that would have been the next step, to

14  notify medical personnel.

15      Q.    When you say secure the scene, what does that

16  mean?

17      A.    That means -- so the housing unit has 40

18  inmates.  Make sure they're secure.  And if there's a

19  clear threat, secure that threat.

20      Q.    After that -- I believe you say you also

21  assessed the situation; is that correct?

22      A.    Correct.

23      Q.    What was your assessment after you got there?

24      A.    Someone was clearly injured.  I did not know

25  why yet.  There was blood on the floor.  Physical

1   injuries and -- yeah.

2        Q.   When you got in G pod, did you talk to

3   anybody?

4        A.   I don't recall, but I'm -- assume that I did.

5   Yes.

6        Q.   Normally in that type of situation, would you

7   go and interview the people involved or talk to the

8   correctional officers who were there on scene?

9        A.   Not personally.  So basically I would assign

10  someone to conduct the investigation, and if medical

11  treatment is needed, I would instruct personnel to -- to

12  transport the individual to the hospital, if necessary.

13       Q.   Do you recall if you instructed medical

14  personnel to do anything with Mr. Stilwell or

15  Mr. Beaver?

16       A.   Medical personnel has their own management, so

17  they dictate to us what needs to happen, depending on

18  the severity of the injury.

19       Q.   And who is the -- who's in charge of medical

20  management at the time of the incident?

21       A.   It's Wellpath now.  I believe the name may

22  have been different then, but...

23       Q.   Do you remember any particular medical staff

24  or medical personnel who would have been in charge of

25  management at the time?

```
1      A.    I do not.  No.

2      Q.    Do you know who it is currently?

3      A.    Tara Foster, I believe.

4      Q.    Do you know if Tara Foster was employed at the

5   jail at the time of the March 7, 2019, incident?

6      A.    She was, but I don't believe she was acting in

7   that position at that time.

8      Q.    Who did you assign to conduct the

9   investigation?

10     A.    Correctional Deputy Yee.

11     Q.    And what normally happens when you assign a

12  correctional officer to do an investigation?

13     A.    They obtain photos of everyone involved,

14  photos of the scene, Mirandize all parties, and then

15  author the criminal report and -- and submit that to the

16  DA's office for prosecution.

17     Q.    And approximately how long does that process

18  take?

19     A.    Depends on the case.  I mean, anywhere from an

20  hour to 12 hours, depending on the severity of the case.

21     Q.    Do you have any idea how long Correctional

22  Officer Yee spent in this investigation?

23     A.    I don't recall.  No.

24     Q.    Given what you do know about the situation,

25  would you believe the investigation would be on the
```

1    lower end or the longer end?

2         A.   Hard to say.  I mean, it was done in a timely

3    fashion.  I know that.

4         Q.   Do you recall speaking to Clarence Beaver

5    after the incident?

6         A.   I do not.

7         Q.   Is it possible that you could have?

8         A.   Very possible.  Yes.

9         Q.   Would you say that it was probable that you

10   did?

11        A.   Could be.  I mean, due to the scope of time

12   that's passed, I have hundreds of interactions a day.

13   It's hard to recall an individual interaction.

14        Q.   Did Correctional Officer Yee take any

15   statements from you?

16        A.   No.

17        Q.   Did Correctional Officer Yee interview you at

18   all as a process of the investigation?

19        A.   No.

20        Q.   Do you recall do you recall speaking with

21   Joseph Stilwell after the incident?

22        A.   I don't recall, but it may be probable.  Yes.

23        Q.   Now, since it was probable, what would be a

24   normal conversation that you would have had with

25   Mr. Stilwell after an incident like this?

1          A.    General conversation.  Anything outside of

2    Miranda, you know, we're going to get you to the

3    hospital.  You're going to be okay.  You're safe now.

4    Things of that nature.

5          Q.    And would that have been the same type of

6    questions that you would have asked Mr. Beaver?

7          A.    I don't recall, but yes.  The same.

8          Q.    Do you recall speaking with Mr. Hernandez

9    after the incident?

10         A.    Not that I recall.  No.

11         Q.    With him being the -- the alleged attacker in

12   the situation, would your questions be different for him

13   than for Mr. Beaver and Stilwell?

14         A.    I mean, they weren't necessarily questions.

15   It's conversation.  Deputy Ye's conducting the

16   investigation, not me.  So there wouldn't be questions.

17         Q.    The conversation with Mr. Hernandez, would it

18   be different from the ones that you may have had with --

19         A.    Not necessarily.  Not knowing the scope of the

20   case and what happened yet.

21         Q.    When you first heard about the incident on the

22   radio, did you hear that there was a 415 in G pod?

23         A.    That -- that's the standard nomenclature we

24   use.  Whether he said that or not, I don't recall.  But

25   more than likely, that's what he said.  Correct.

1   Q. And what does 415 mean?

2   A. Physical altercation.

3   Q. Prior to arriving into G pod at the time of

4 the incident -- I'm sorry -- shortly after the time of

5 the incident, did you have any other information about

6 what was going on?

7   A. No.

8   Q. After Correctional Officer Yee completed his

9 investigation, did he generate a report?

10   A. Yes.

11   Q. Did you review the report?

12   A. I did.  Yes.

13   Q. Is there anything that stands out in your mind

14 about the report?

15   A. No.

16   Q. Prior to March 7, 2019, were you familiar with

17 Mr. Hernandez?

18   A. I've had contact with him in the past, but

19 it -- just in passing.

20   Q. Are there any specific incidents, though, that

21 you recall with regards to Mr. Hernandez prior to

22 March 7, 2019?

23   A. No.

24   Q. Are you aware of any policies at the jail with

25 regards to how to monitor inmates who are suicidal?

1      A.    Yes.

2      Q.    What -- what are those policies?

3      A.    So as far as the deputy's end goes, we welfare

4   check them once every 15 minutes to be -- ensure their

5   well being.

6      Q.    Anything else besides checking on them every

7   15 minutes?

8      A.    The cells that they're housed in are -- are

9   searched prior and they're given protective garments so

10  they can't hurt themselves with that.   Yeah.

11         MR. WASHINGTON:   Sorry, belated.   But just to

12  interject, I'll object that there are written policies.

13  They will speak for themselves and be the best evidence

14  of what they contain, but certainly you're free to

15  continue asking him about his understanding of those

16  policies.

17  BY MR. MARQUEZ:

18     Q.    Are -- are you aware of any policies at the

19  jail with regards to monitoring inmates who are

20  diagnosed with bipolar disorder?

21     A.    No, I'm not.

22     Q.    Are you aware of any policies with the jail

23  with regards to monitoring inmates with mental health

24  disorders?

25     A.    No.

1      Q.   If -- if an inmate is on suicide watch, are

2   there policies and practices in place to determine what

3   happens or where does he go after he's off of suicide

4   watch?

5      A.   No.  So there's no post-suicide watch.  Mental

6   health personnel follow up with them, of course, but

7   there's not a special housing unit for them.  There's

8   not a, you know, monitoring log or anything like that.

9   No.

10      Q.   So then in practice, what is the typical

11   process that -- that you take once an inmate is coming

12   off of suicide watch?

13      A.   Yeah.  If mental health personnel determines

14   they're no longer a threat to themselves, they get

15   housed per their classification and -- and a lot of

16   their normal jail-issued clothing and they're housed in

17   the general housing unit wherever they classify for.

18      Q.   If an inmate is coming off of suicide watch,

19   do they return to their normal -- or, I'm sorry.  Not

20   normal, but to their previous classification?

21      A.   They can.  Yes.  It doesn't always happen, but

22   yes.

23      Q.   Does an inmate get assessed for

24   reclassification after coming off of suicide watch?

25      A.   That, I don't know.

1        Q.    Is there anybody that you think would know the
2   answer to that question?
3        A.    Classification would know the answer to the
4   question.   Yes.
5        Q.    Is there a head or lead officer in
6   classification?
7        A.    Sergeant Mel supervises the classification
8   unit.
9        Q.    Do you know if Sergeant Mel supervised the
10  classification unit in 2019?
11       A.    I believe so.   Yes.
12       Q.    Earlier, you said that you reviewed the report
13  that was created by Correctional Officer Yee, correct?
14       A.    Uh-huh.
15       Q.    Is that a yes?
16       A.    Yes.
17       Q.    Did you -- did you learn anything after
18  reading the -- the report?
19       A.    It has a basic outline of what happened.
20  Yeah.   I reviewed the video as well, so the report
21  concurred with the video, so...
22       Q.    Was there anything that caught your attention
23  in particular when you reviewed the report and the
24  video?
25       A.    No.

1       Q.    When you reviewed the -- the video of G pod

2    from March 7, 2019, did you notice Mr. Hernandez with a

3    broom?

4       A.    It appeared that he picked up an object.   I

5    did not know it was a broom.   Due to the lighting and

6    due to his route that he took against the wall in the

7    housing unit, it was pretty hard to determine what he

8    actually had.

9       Q.    You -- you said "due to the lighting."   I'm

10   assuming the lights were off at the time of the -- the

11   footage?

12      A.    The nighttime lights are on, but they are dim.

13   Correct.

14      Q.    Is it easier to view into G pod at nighttime

15   through the -- the video footage or with a naked eye?

16      A.    Video footage, for sure.   Yes.

17      Q.    So if you were to look into G pod at

18   nighttime, do you have a better visual through the --

19   the video monitor or with your own eyes?

20      A.    Through the monitor, for sure.   The camera

21   picks up more ambient light than you do with your eye at

22   night.   That's for sure.

23      Q.    Have you had any complaints or concerns

24   expressed with regards to any areas of G pod that are

25   difficult to see through the -- the video monitor?

1        A.    Not that I recall.  No.

2        Q.    Do you have any concerns about not being able

3   to see areas of G pod through the video footage?

4        A.    All areas -- areas are visible.  It's no

5   light, of course, or if it's dark, of course.  But it's

6   sufficient.

7        Q.    I'm sorry.  I couldn't hear -- couldn't hear

8   what you said when you -- you were talking about -- are

9   there -- let me -- let me try that again.

10             Are there any other areas when you're viewing

11   through the video footage of G pod that are difficult to

12   see?

13        A.    Yes.  Due to the layout of the box, due to

14   inmates' bodies, due to structures in the housing unit.

15   So...

16        Q.    So what sections of G pod would be difficult

17   to see because of the factors that you just outlined?

18        A.    Left-hand side of the bottom tier.  The --

19   the -- the bottom tier, in general.

20        Q.    And when you say left-hand side of the bottom

21   tier, that would be coming from the perspective of if

22   you were in the tower looking into G pod; is that

23   correct?

24        A.    Correct.  Yes.

25        Q.    What about if you're looking into G pod with

1    your own eyes?  Are there sections of the pod that are

2    difficult to see?

3        A.    Yeah.  Same as we just spoke about.

4        Q.    Since being employed at the jail, have you

5    ever received an employee handbook?

6        A.    No.

7        Q.    Is there one available digitally at the jail?

8        A.    There's a jail handbook, but it's not an

9    employee handbook.  No.

10        Q.    Have you ever received a hard copy of a jail

11    handbook?

12        A.    Yes.

13        Q.    Okay.  Approximately when was that?

14        A.    2008 and on.  Yeah.  They're readily

15    available.

16        Q.    And is it readily available through the

17    intranet?

18        A.    It's there and in hard copy.  Yes.

19        Q.    And when's the last time you reviewed it?

20        A.    Unknown.

21        Q.    Best estimate?

22        A.    Six months ago, maybe.

23        Q.    Sergeant, I'm going to hand you a document

24    that's been marked as Exhibit 1.  This was previously

25    marked earlier today for the deposition of

```
1    Lieutenant Agurgkis.   Sorry.

2                  (Whereupon Exhibit 1 was marked for

3                  identification.)

4    BY MR. MARQUEZ:

5         Q.   I'm going to ask you to take a look at the

6    first page, which would be Bates stamp 1.

7              Is this one of the documents that you reviewed

8    in preparation for this deposition?

9         A.   Yes.

10        Q.   Now, at the -- at the bottom left hand,

11   there's a checkmark next to body camera recorded.

12        A.   Okay.

13        Q.   Do you see that?

14        A.   I do.

15        Q.   Does that mean that Elvis Yee had a body

16   camera on him during the course of his investigation?

17        A.   That's what it depicts, but I believe that was

18   done in error.   I don't believe he actually had the body

19   camera.

20        Q.   And why do you think --

21        A.   That's just speculation, because I don't think

22   they were readily available at that time.

23        Q.   Why weren't they readily available at that

24   time?

25        A.   We initially had some issues with the
```

```
1    infrastructure of the cameras themselves.
2        Q.   Can you explain what that means?
3        A.   The clips were broken and they were not
4    serviceable.  So...
5        Q.   And when did that first become an issue?
6        A.   Don't know.  Don't know.
7        Q.   When were body cams first utilized at the --
8    at the jail?
9        A.   I don't know for sure.  I would say probably
10   shortly before this date.
11       Q.   Are body cameras utilized at the jail
12   currently?
13       A.   They are.  Yes.
14       Q.   The infrastructure problems that you mentioned
15   earlier, have those been resolved between 2019 and
16   present?
17       A.   They have been currently.  Yes.
18       Q.   Approximately when were those issues resolved?
19       A.   Just an estimate, maybe ten months ago.
20       Q.   Prior to ten months ago, were body cameras
21   used at the jail at all?
22       A.   They were available.  I can't state when and
23   frequency of use.  They're not mandatory worn by the
24   deputies on a daily basis is what I'm saying.
25       Q.   So when are body cameras used?
```

1        A.    Basically at this point, it's officer

2   discretion and -- yeah.  That's where we stand at this

3   point.  That would be a policy issue for the admin.

4        Q.    And how long has it been the policy that

5   officer can use a body camera at his or her discretion?

6        A.    I believe since their inception.  If there's a

7   policy regarding them being mandatory, I'm not aware of

8   that.

9        Q.    Can you give examples of what types of

10  circumstances or instances a correctional officer would

11  utilize a body camera at the jail?  Sorry.

12       A.    Basically anything out of the ordinary that's

13  not common daily duty practice.  Uncooperative bookings,

14  misconduct claims, predicted use of force situations

15  where someone is barricading the cell and more than

16  likely force is going to be used to be able to secure

17  that person.

18       Q.    And are those examples of the same types of

19  situations that a body camera would have been used at

20  the jail in 2019?

21       A.    Yes.

22       Q.    In -- in March of 2019, were body cameras used

23  at all at the jail?

24       A.    I don't recall.  Yeah.  Like I said, due to

25  the scope of time and -- and thousands of interactions

1    to this date, I can't speak to a certain date.

2         Q.   So just -- just -- just to clarify, body

3    cameras were first available to be used at the jail

4    sometime in 2019 or earlier?

5         A.   I don't know the -- the exact implementation

6    date, but it's been three or four years.  Yes.

7         Q.   But up until about ten months ago, there was

8    problems with -- with the function of the body cameras;

9    is that fair to say?

10        A.   Correct.

11        Q.   Even though that there had been problems up

12   until ten months ago, were body cameras ever used at the

13   jail prior to ten months ago?

14        A.   I can't speak to the frequency; but like I

15   said, being a -- a voluntary basis, some deputies may

16   wear them, some deputies may not.  So I can't speak to

17   the daily duties of everybody who works in the jail.

18        Q.   Have you ever used a body camera while at the

19   jail?

20        A.   Every day.

21        Q.   When did you first start using a body camera

22   at the jail?

23        A.   It's been approximately a year ago.

24        Q.   Prior to a year ago, did you ever use a body

25   camera at the jail?

1          A.    No, I did not.

2          Q.    In 2019, do you recall seeing if any of the

3    correctional officers were using body cameras?

4          A.    I don't recall, but it was probably a very low

5    frequency.

6          Q.    And so it's your -- it's your belief that --

7    that checkmark on body camera on Petitioner's Exhibit 1,

8    Bates stamp 1, is an error?

9          A.    I can't say that for sure, but my -- my first

10   thought is that is probably an error.   Correct.   Because

11   the body cam footage would have been included in the

12   case.

13         Q.    Where was body cam footage in 2019 stored?

14         A.    So it all -- there's four body cameras for the

15   whole facility, for one.   And those all go to a common

16   Cloud base which each camera has its own log-in that a

17   deputy can log in, search through the cloud database,

18   find their content, and then download it.

19         Q.    Who -- who's in charge of maintaining the

20   Cloud where the body cam footage is -- is stored?

21         A.    I'm not aware of that.

22         Q.    Do you know who -- who would have that

23   information?

24         A.    Captain Hovy would have that information.

25         Q.    And what's Captain Hovy's first name?

1        A.    Darrell.

2        Q.    Have you ever seen body cam -- body cameras

3   used in conjunction with an investigation at the jail?

4        A.    Yeah.  Common practice when they are used is

5   during the Miranda process.

6        Q.    Any other common practices for use of the body

7   camera?

8        A.    Like I said, criminal incidents.  When

9   there's -- there's a known -- known threat, the

10  individual can activate the camera.

11       Q.    Sergeant, I'd like to ask you to turn to Bates

12  stamp 44 of Exhibit 1.  And if you could just take a

13  look at that and let me know when you're done reading

14  it.

15       A.    Where is that at?

16             MR. WASHINGTON:  So it's page 44.  Bottom

17  right is where the page numbers are.

18             THE WITNESS:  Gotcha.

19             MR. WASHINGTON:  There you go.

20             THE WITNESS:  Okay.

21  BY MR. MARQUEZ:

22       Q.    The -- the document is a corrections division

23  incident report from March 6th, 2019; is that correct?

24       A.    That date is incorrect.  Yes.

25       Q.    I'm sorry.  Did you say that date is

1    incorrect?

2         A.    Let's see.   The incident occurred on the 7th,

3    correct?

4         Q.    That -- that's my understanding.

5         A.    Okay.

6         Q.    The incident report, though, the one that's on

7    page 44, the date on it is -- is March 6th, 2019,

8    correct?

9         A.    That date and time must not be correct because

10   that's before the incident.

11        Q.    I agree.   I just want to make sure that we're

12   looking at the same document.

13        A.    No, right.   Yes.   Sorry.   Sorry.

14        Q.    All right.   Thank you.

15             The names of all the correctional officers who

16   responded to the incident are listed in there, correct?

17        A.    I assume so.   Yes.

18        Q.    Among those names, it includes Deputy Esteban

19   Perez, correct?

20        A.    Yes.

21        Q.    And at the time of the incident, Deputy Perez

22   was at Delta tower, which I believe is also referred to

23   as post 22; is that correct?

24        A.    Correct.   Yes.

25             MR. WASHINGTON:   I'm going to interject

1    belatedly and object that it misstates the -- it

2    misstates the document.  You -- you said that it lists

3    the people who responded to the incident, and the

4    document doesn't say that about Deputy Perez.

5            Am I misreading it?

6    BY MR. MARQUEZ:

7        Q.   Well, let me ask it this way.  Is it your

8    understanding that Deputy Perez was the correctional

9    officer in the tower at the time of the incident?

10       A.   Correct.  Yes.

11       Q.   And I'm sorry.  When I say "tower," I mean

12   post -- post 22; is that fair?

13       A.   Correct.

14       Q.   Okay.  And Deputy Perez was the one who called

15   the 415, correct?

16       A.   Yes.

17       Q.   Do you know if Deputy Perez was interviewed as

18   part of Correctional Officer Ye's investigation?

19       A.   I do not.

20       Q.   Do you think that Correctional Officer Yee

21   interviewing Deputy Perez would have been helpful to the

22   investigation?

23       A.   Hard to say.  I mean, the -- the -- the

24   surveillance footage pretty much shows everything that

25   he would have observed, so...

1        Q.    So are -- are you saying that the

2    investigating officer could just review the -- the video

3    in conducting the investigation?

4        A.    Review the video, interview the parties

5    involved, and -- and -- yeah.  I mean, I don't really

6    know what you're asking.

7        Q.    Do you think it would have been helpful for

8    the investigating officer to also speak with Deputy

9    Perez?

10       A.    I don't --

11            MR. WASHINGTON:  Objection.  Asked and

12   answered.  Argumentative.

13            Go ahead.

14            THE WITNESS:  No.  Because the video is his

15   point of view of exactly what he would have saw, so...

16   BY MR. MARQUEZ:

17       Q.    When investigations are -- are done, is -- is

18   there a procedure as far as who gets interviewed or what

19   gets reviewed?

20       A.    Well, the footage from the time and date of

21   the incident gets reviewed, of course.  And the involved

22   parties get Mirandized, interviewed, and then -- yeah.

23   That's...

24       Q.    So is it -- is it uncommon for an

25   investigating officer to interview correctional officers

1   who respond to the scene?

2        A.   Correct.

3        Q.   Do you recall any investigation in the past

4   five years that included the investigating officer

5   interviewing the correctional officers on scene?

6        A.   Not -- you know, I can't identify a certain

7   case, but if someone was assaulted or a deputy was

8   assaulted, then, of course, their -- their -- their

9   testimony would have to be given then, right?

10       Q.   I think I recall you mentioning earlier that

11  two deputies were also sent to the hospital shortly

12  after this incident; is that correct?

13       A.   Uh-huh.

14       Q.   Is that a yes?

15       A.   Yes.

16       Q.   I'm sorry.  I'm not trying to be rude.  It's

17  just --

18       A.   I have a speech impediment.  I'm sorry.

19       Q.   No apology necessary.  I apologize.

20            Who were the officers that were injured?

21       A.   No --

22       Q.   Let me try that again.

23       A.   Okay.

24       Q.   Who are the two officers that went to the

25  hospital?

1      A.    So correctional deputies provide transport for

2   the inmates to the hospital.  They're not seeking

3   medical treatment themselves.  They are simply

4   transporting and supervising those inmates at the

5   hospital.

6      Q.    Thank you for that clarification.  So I think

7   I misunderstood you earlier.

8          So when you say that there were two officers

9   that went to the hospital, they were there in a

10  transport function --

11     A.    Provided transport.

12     Q.    They provided transport for Mr. Beaver and

13  Mr. Stilwell; is that correct?

14     A.    Correct.

15     Q.    Thank you for that.  I'd like to direct your

16  attention to Bates stamp 5 on Exhibit 1.

17          Are you familiar with this type of document?

18     A.    I am not.  The classification unit is out of

19  my scope of duty.

20     Q.    And so Bates stamp 5 is classification housing

21  assignment document; is that --

22     A.    Correct.  That's what the title is.  Correct.

23     Q.    And I believe you testified earlier that the

24  person in charge of the classification unit right now is

25  Sergeant Mel, is that correct?

1        A.    Yes.

2        Q.    What's Sergeant Mel's first name?

3        A.    David.

4        Q.    And I understand that classification is not

5    necessarily what you -- what you do right now, but have

6    you seen this type of documentation before?

7        A.    I've never worked classification a day in my

8    career.  No.

9        Q.    If I were to ask you what J 20 means, do you

10   know what that indicates?

11       A.    No.  No idea.

12       Q.    I'd like to ask you to turn to Bates stamp 12.

13   The top of the document reads "In-custody reassessment

14   scale."

15            Is this the type of documentation that you've

16   seen before?

17       A.    I have not.  Once again, this pertains to

18   classification, I believe.

19       Q.    And are you not familiar with it, or you've

20   never seen this -- this type of form before?

21       A.    I may have seen it in passing, but it's not a

22   common -- it's not my scope of duty that I...

23       Q.    If you know, what is population management

24   program?

25       A.    I assume that it's -- that it's population

1  management.  Sorry.

2          MR. WASHINGTON:  Only if you know.

3  BY MR. MARQUEZ:

4      Q.   Do you know what SPP stands for?

5      A.   Suicide prevention protocol.

6      Q.   Now, is -- does suicide prevention protocol

7  refer to a certain set of written criteria?

8      A.   I assume so, but the protocol itself is --

9  someone displaying self-harming actions, thoughts, or

10  statements get this placed on -- on protocol for safety.

11     Q.   Do -- do you know if a person on suicide watch

12  gets placed in any particular housing area of the jail?

13     A.   Single cell.  Correct.  Yes.

14     Q.   And what housing units or pods does --

15     A.   There's various.

16     Q.   Can you list them for me?

17     A.   So we have holding 1, holding 2, booking 2,

18  booking 3, booking 4, W5, W6, U1, 2, 3, T1, T2, and P1,

19  P2, P3, and all of A pod -- or lower tier of A pod.  I'm

20  sorry.

21     Q.   In total, approximately how many single cells

22  are there?

23     A.   I would say 40 -- approximately 40-something.

24  I would have to look at the...

25     Q.   I'd like to ask you to turn to Bates stamp 47

1      of Exhibit 1.   The title of the document is

2      "Butte County Sheriff's Office Corrections Division

3      Incident Report," correct?

4           A.   Correct.  Yes.

5           Q.   Is -- is this the type of document that you've

6      seen before and are familiar with?

7           A.   Yes.

8           Q.   Are -- are you familiar with Correctional

9      Officer E. Bossen?

10          A.   Yes, I am.  He's no longer with us.

11          Q.   As of when?

12          A.   Approximately three years.

13          Q.   What's Mr. Bossen's first name?

14          A.   I believe it's Adrian, if I remember right.

15          Q.   Do you have any idea where he's employed

16     currently?

17          A.   I believe he's out of state somewhere.

18          Q.   Bates stamp 47 includes a date of

19     February 25, 2019; is that correct?

20          A.   Yes.  That's on the report.  Yes.

21          Q.   Do you have any recollection of this incident?

22          A.   I do not, no.  I don't believe this was on my

23     shift.

24          Q.   The -- the document depicts that Mr. Hernandez

25     was moved because of disruptive conduct; is that

1   correct?

2        A.   Yes.

3        Q.   There's, towards the end of the document, a

4   statement that says "Hernandez was then escorted out of

5   M pod due to his disturbance of the pod and manipulation

6   of his housing classification and behavior."

7             Do you see that?

8        A.   I do.  Yes.

9        Q.   If you know, do you know what that reference

10  to manipulation of housing classification means?

11       A.   I do not, no.

12       Q.   Have you ever heard that term before?

13       A.   Yes, I have.

14       Q.   In what context have you heard that term used?

15       A.   Some inmates will want to be housed in a

16  certain location, so they will basically act out to try

17  to get to where they want to go.

18       Q.   Based on your experience, why would an inmate

19  do -- why would an inmate act out to get to a different

20  pod?

21       A.   There's various things.  Maybe they have

22  family members, friends.  Maybe they're owed debts in a

23  certain housing they came from before.  There's a myriad

24  of reasons.  It's kind of an individual thing.  There's

25  no really standard answer for that.

1      Q.   In your experience as an officer at the jail,

2   do you monitor more closely inmates who are found to be

3   disruptive?

4      A.   Well, no, because simple fact is all 600

5   inmates that are in county jail are disruptive.  They're

6   there for a reason.  So unless someone commits an overt

7   act that is highly known, it's pretty hard to know

8   what's going on with each individual inmate, so...

9      Q.   And can you give me examples of what an overt

10   act means?

11      A.   We have stabbings.  We have in-custody deaths.

12   We have suicide attempts.  We have multiple critical

13   incidents, hospital trips per day.  We have injuries.

14   We have, I mean, just a myriad of things every single

15   day, so...

16      Q.   Prior to March 7, 2019, do you know if

17   Mr. Hernandez had conducted any of those types of

18   activities that you had just listed?

19      A.   I have no idea.

20      Q.   And what type of records would should show

21   Mr. Hernandez's history of conduct in the jail?

22      A.   I assume it would be in his classification

23   file, so...

24      Q.   Are there any other records or folders or

25   files for inmates besides their classification?

1          A.    I believe all that stuff is in classification;

2     but as I spoke before, that's not my scope of duty,

3     so...

4          Q.    And just to make sure that I asked the

5     question clear enough, other than a classification file,

6     are there any other files that -- that are maintained at

7     the jail for the inmates?

8          A.    Not that I maintain.  No.  So if a

9     classification has additional files, they would have to

10    speak on that point.

11         Q.    I'd like to ask you to turn to Bates stamp 50

12    of Exhibit 1.  The title is "Butte County Sheriff's

13    Office Interdepartmental Memorandum."

14                Have you ever seen that before?

15         A.    I have.  Yes.

16         Q.    The -- the date of it is February 6th of 2019,

17    correct?

18         A.    Yes.

19         Q.    After you're done reading it, can you let me

20    know when you're ready?

21         A.    Ready.

22         Q.    According to the document, Mr. Hernandez was

23    evicting himself from G pod housing; is that correct?

24         A.    Yes.

25         Q.    What does evicting himself from G pod mean?

1      A.    So if an individual does not want to be housed

2    in the housing unit, they will gather their belongings

3    and stay in the dayroom, stay at the door.   And then

4    when the deputies do their security checks, they will

5    contact that person.   And if they say they fear for

6    their safety, we have to take them out.

7      Q.    Do you have to automatically take them out if

8    they say --

9      A.    No.   If it's some frivolous thing, no.   If

10   it's determined to be -- it's up to the officer's

11   discretion whether a threat is posed to that person or

12   not.

13     Q.    According to -- to the document, Mr. Hernandez

14   was being placed on suicide watch, correct?

15     A.    Yes.

16     Q.    And then the document also indicates that

17   because of a -- a lack of bed or lack of housing --

18     A.    Correct.

19     Q.    -- he had to be placed in an interview room;

20   is that correct?

21     A.    Yes.

22     Q.    Is that something that's common at the jail?

23     A.    We try to avoid it, but yes.

24     Q.    What -- what steps do you take to try to avoid

25   that type of situation?

1      A.    So once medical places someone on -- on

2  suicide watch prevention, they make contact to

3  classification and then it's classification's

4  responsibility to find them a housing unit.

5      Q.    How many cells are there in administrative

6  separation?

7      A.    Let's see.  16, 30 -- depends because that's

8  not really a valid question because some are female,

9  some are male.

10     Q.    Let's start with total.

11     A.    I would have to see the floor plan to count

12  them for sure.

13     Q.    What's your best estimate?

14     A.    I would say over 40.

15     Q.    And then just for males?

16     A.    So some of the housing units can be either

17  male or female, depending on who's housed there as well.

18  So I would say maybe 32.  I mean, that's just off the

19  top of my head.  That's not an accurate number.

20     Q.    It's fair to say that 32 is just an estimate,

21  correct?

22     A.    Right.  Right.

23     Q.    Are there any cameras inside post 22 that

24  monitor what happens inside the tower?

25     A.    No.  Not that I'm aware of, anyway.

1      Q.    What's your current shift right now?

2      A.    Weekend nights.  Friday through Sunday --

3  Friday through Monday, 7:00 p.m. to 7:00 a.m.

4      Q.    And back in March of 2019, were you working

5  night shifts?

6      A.    It was night shifts.  I don't know what

7  rotation or what day of the week it was, though.

8      Q.    Okay.  I'm going to ask the court reporter to

9  mark a video, G pod main, that was provided in

10  discovery.

11               (Whereupon Exhibit 4 was marked for

12               identification.)

13  BY MR. MARQUEZ:

14      Q.    And then I'm going to show you on this, we're

15  at the very start of the video.  At the bottom right

16  hand corner, it says March 7, 2019, at 2:53:56 a.m.; is

17  that correct?

18      A.    Yes.

19      Q.    And the perspective of this video is -- is

20  that from post 22 looking into G pod?

21      A.    Correct.  Yes.

22      Q.    Are there -- are there normally cleaning

23  supplies left in G pod?

24      A.    Yes.

25      Q.    Do they stay there 24 hours, 7 days a week?

1      A.    Yes.  Yes.

2      Q.    Do they have a designated spot or location

3  where they're supposed to be kept?

4      A.    Not necessarily.  Common practice is right by

5  the trash cans there.

6      Q.    And when you say "the trash cans," if I'm

7  looking at this G pod main footage, is that in the lower

8  right hand side of the screen?

9      A.    Right.  Right next to the shower.

10      Q.    Are -- are the cleaning supplies ever taken

11  out?

12      A.    The mop bucket and the disinfectant bottles

13  are taken out once per shift to be filled and then

14  placed back in.

15      Q.    Is there a designated time where they're

16  supposed --

17      A.    No.

18      Q.    -- to be taken out --

19      A.    No.

20      Q.    -- or it just has to be one time per shift?

21      A.    Right.

22      Q.    And who's responsible for cleaning G pod?

23      A.    The inmates housed in it.

24      Q.    Is there any sort of schedule for it?

25      A.    No.

1      Q.    Is there any sort of designation as to which

2    inmates have to do it?

3      A.    No.

4      Q.    What type of cleaning supplies are provided by

5    the jail?

6      A.    There's Windex.  There's One Step

7    disinfectant.  There's a mop bucket that has One Step

8    disinfectant in it and a shower brush and a push broom

9    head and a wand handle.

10      Q.    Have you ever seen an inmate remove a handle

11    from -- from the broom head?

12      A.    Yes.  Daily.  Because the handles switch back

13    and forth from the shower brush to the -- the push broom

14    head.

15      Q.    What time is lights out?

16      A.    10:00 o'clock.

17      Q.    And what time do the lights come back on?

18      A.    Chow in the morning is around 5:00 a.m.

19      Q.    Is -- is -- is it common for inmates to be

20    walking around after lights out?

21      A.    Yes.  I mean, they use the trash cans and

22    the -- the water fountain.

23      Q.    I'm going to hit play on the video.  And I

24    believe you said you reviewed this video approximately

25    30 days ago?

```
1        A.    Correct.

2        Q.    Does this look like the same video that you

3   reviewed?

4        A.    Yes, it does.  Yes.

5        Q.    And so I'm going to pause the video at

6   2:54:21.

7             Is that your understanding that that's

8   Mr. Hernandez walking on the lower left hand side of the

9   screen?

10       A.    Correct.

11       Q.    Is -- is that uncommon or unusual for an

12  inmate during this time of the day to be walking in that

13  area of the pod?

14       A.    There is nothing common in the jail.  There is

15  activity 24/7.

16       Q.    So at this point in the video, is there

17  anything concerning about Mr. Hernandez's behavior --

18       A.    No.

19       Q.    -- in your opinion?

20       A.    No.

21       Q.    So I'm going to hit play again.  I'm going to

22  pause the video at 2:54:39.

23             In -- in viewing the video, is that

24  Mr. Hernandez in the lower right hand corner?

25       A.    I believe so.  Yes.
```

1          Q.   And what -- what did you observe him doing

2     when you -- when you saw the video?

3          A.   He appears to be taking the mop handle off of

4     one of the implements.

5          Q.   Is that behavior concerning at this point?

6          A.   It's not appropriate time to be cleaning; but,

7     I mean, once again, there's constant activity.  I mean,

8     yeah, it's -- it's abnormal, but it's not alarming.

9          Q.   If -- if you had seen this behavior at this

10    time of the day, would you say anything or do anything

11    at this point?

12         A.   If I would have saw it, yeah.  I would have

13    called in there and said, "Hey, man, what are you doing?

14    Go back to your rack."  So...

15         Q.   I'm going to hit play again.  And I'm going to

16    hit pause at 2:55:15.

17              There's a blue trash can in the lower right

18    hand corner.

19         A.   Correct.  Recycle.  Right.

20         Q.   Did you observe Mr. Hernandez bending over

21    somewhere in that area by the blue recycling?

22         A.   Yes.

23         Q.   Is there anything kept in that area, to your

24    knowledge?

25         A.   That's where the cleaning supplies are

1    sometimes.  Not always, but yes.

2         Q.   And I'm going to pause it at 2:55:23.

3              Is that Mr. Hernandez on the left wall, if

4    you're looking at this video?

5         A.   Yes.

6         Q.   Do you see anything in his hands?

7         A.   On the video, yes.  Appears he has an object

8    in his hand.

9         Q.   Is -- is that concerning to you at that point?

10        A.   I mean, not necessarily.  I mean, he could be

11   sweeping off his bunk, cleaning out his drawer.  I mean,

12   that's a...

13        Q.   Have you -- have you seen an inmate sweep off

14   his bunk --

15        A.   Absolutely.  Right.

16        Q.   -- or area at 2 or 3 in the morning before?

17        A.   Absolutely.

18        Q.   Do you see, either now or in your previous

19   review of this footage, a broom head or mop head in

20   Mr. Hernandez's possession?

21        A.   At the time watching the video, it's hard to

22   tell what it is.  Knowing what it is from being present

23   post incident, yes, I know what it is now.  But in

24   real-time, it would be very hard to see.

25        Q.   If -- if you were standing in -- in post 22

1    right now, would it be easier or harder to see

2    Mr. Hernandez at nighttime?

3          A.    Harder to see it, for sure.  And not to

4    mention that there's five other housing units that

5    you're supervising as well, so your focus is not on

6    solely G pod.

7          Q.    If you were looking into G pod at nighttime,

8    would this video image look closer or farther in

9    comparison?  Or the same?

10         A.    Closer and brighter.  Much, much brighter.

11         Q.    I'm going to hit play again.  I'm going to hit

12   pause at 2:55:52.

13               Screen has gone black, right?

14         A.    Right.

15         Q.    Do you know why that is?

16         A.    Yeah.  Because the cameras are motion

17   sensitive.  When there's no motion, there's no capture.

18         Q.    Do you recall what Mr. Hernandez's bunk

19   assignment was on March 7, 2019?

20         A.    I do not.  No.

21         Q.    Do you know what general area his bunk was?

22         A.    I have no idea.  No.  I can't speak to the

23   classification of all inmates.

24         Q.    Understood.  So I've hit pause at 2:56:11.

25               Do you see where Mr. Hernandez in -- in this

1   frame?

2       A.   I do not.  No.

3       Q.   Is that concerning that you don't see where he

4   is?

5       A.   I mean, it's the middle of the night.  And I

6   didn't track him on the video, so I don't know what your

7   question means.

8       Q.   In -- in looking at the video, are the -- are

9   there areas of G pod where you would not be able to see?

10      A.   Yes.  From the tower, yes.  So the deputies do

11  50-minute continuous checks 2/47, too.  So the tower is

12  solely the monitor of this housing unit.

13               (Reporter requests clarification.)

14          THE WITNESS:  50.  5-0.  Sorry.

15  BY MR. MARQUEZ:

16      Q.   So in addition to somebody being in the tower

17  and watching in the G pod, every 50 minutes --

18      A.   Right.

19      Q.   -- a correctional officer is supposed to check

20  into the pod; is that correct?

21      A.   Correct.  Walks the entirety of the housing

22  unit and ensures the well being of each inmate, so...

23      Q.   In the -- in the video, we can't see

24  Mr. Hernandez -- strike that.

25          I'm going to pause it at 2:56:21.

1           Do you see movement in about the middle of the

2    screen?

3        A.    Yes.

4        Q.    Do you have any understanding as to who's --

5    who's bunk that -- that's near?

6        A.    No.

7        Q.    Other than this camera view into the pod, are

8    there any other surveillance cameras?

9        A.    Yeah.   There's an outward-facing camera that

10   faces the access door of the housing unit.

11       Q.    And I see something in the right -- upper

12   right side of the -- of this screen shot.

13           Is that the camera that you're referring to?

14       A.    No.   That's a convex mirror.

15       Q.    So you said that's a convex mirror --

16       A.    Correct.

17       Q.    -- in this view, can you see where the second

18   camera is?

19       A.    I don't believe you can see the camera, but

20   it's approximately here.   So it -- so it's

21   outward-facing on the dayroom and the housing access

22   door.   You cannot see the bunk area.

23       Q.    Is it towards the -- the top of the housing

24   unit?

25       A.    Yes.   It's highly mounted.   Yes.

1          Q.    And pointed downward into the dayroom?

2          A.    Correct.

3          Q.    From that view, would you also be able to see

4     the entrance and exit to the pod?

5          A.    Yes.

6          Q.    But you can't see the -- the video camera on

7     this screen right now; is that correct?

8          A.    I mean, not that I can see.  No.

9          Q.    I'm going to pause the video at 2:57:26.

10              At this point, a number of correctional

11     officers have now entered the pod, correct?

12         A.    Right.  Right.

13         Q.    Do you recognize yourself in this?

14         A.    Yes.

15         Q.    Which one are you?

16         A.    Right here.

17         Q.    Is that the -- the third officer in line?

18         A.    Sure.

19         Q.    After -- after looking at this video, does

20     that refresh your recollection or change any of your --

21     your previous testimony on what occurred on -- at the

22     time of the incident?

23         A.    I don't believe so.  No.

24         Q.    Is there a maintenance log that's kept for the

25     cleaning supplies that are left in G pod?

1        A.   Yes.

2        Q.   And what's recorded on that log?

3        A.   Just that the spray bottles are present and

4   the mop heads and things of that nature.

5        Q.   Where is that log kept?

6        A.   There's a -- a janitorial closet on -- in the

7   corridor.

8        Q.   Are -- are there any policies or restrictions

9   on -- on inmates cleaning after lights out?

10        A.   I don't believe there's verbiage re --

11   strictly cleaning after lights out.  I mean, they're

12   supposed to be confined to their bunk area; but like I

13   said, they have to enter the dayroom to use the trash

14   can, recycling can, the water fountain, so...

15        Q.   Where's the water fountain located in the pod?

16        A.   Right here (indicating).

17        Q.   Now, you pointed to an area in about the

18   middle right side of the screen.

19             Is that near the entrance to the restroom?

20        A.   Yes.  Lower tier restroom.  Yes.

21             MR. MARQUEZ:  We've been going for over an

22   hour.  Do you need to take a break?

23             THE WITNESS:  No.  I'm good.

24             MR. MARQUEZ:  Okay.  Madam Court Reporter, do

25   you need a break at all?

1           THE STENOGRAPHER:  I'm fine, counsel.  Thank

2    you.

3                (Discussion off the record.)

4           MR. MARQUEZ:  All right.  No further questions

5    at this time.

6           Linda, do you have any questions for the

7    sergeant?

8           MS. McCREARY:  I'm muted.  No, I don't.

9           MR. WASHINGTON:  Okay.  I just have one or two

10   really quick follow ups.

11              **EXAMINATION BY MR. WASHINGTON**

12      Q.   So, Sergeant, earlier, counsel asked a couple

13   of questions about whether you spoke to Mr. Beaver or

14   Mr. Stilwell after the incident.  You stated you didn't

15   recall.

16           So you didn't -- you didn't -- you don't

17   recall whether you spoke to them in the immediate

18   aftermath of the incident, is that fair to say?

19      A.   Correct.  Yes.

20      Q.   Do you recall any time when either one of

21   those individuals said anything to you about the

22   incident?

23      A.   I vaguely remember sometime afterwards, within

24   a day or two, Mr. Stilwell got out of the hospital and

25   he stated, "Thank you for taking care of me."

1      Q.    Okay.  I'm sorry.  So you said when

2   Mr. Stilwell -- after he had returned from the hospital,

3   he thanked you for taking care of him?

4      A.    Correct.  Yes.

5      Q.    Okay.  Anything else that you remember about

6   the -- either one of those individuals talking to you

7   later?

8      A.    No, I do not.

9      Q.    Okay.  And then -- and then you testified

10   earlier when -- when you and -- when counsel was

11   reviewing the video with you, the portion when

12   Mr. Hernandez appeared to be unscrewing the handle from

13   whatever it was attached to -- we couldn't see that in

14   the frame, correct?

15      A.    Correct.  Yes.

16      Q.    And I believe if I accurately wrote down, the

17   gist of your testimony was that if you had seen that in

18   real-time, you would have -- and you were assuming you

19   were the -- in the tower, you would have utilized the

20   intercom to call in to the housing unit and say

21   something to the effect of, "What are you doing?  Go

22   back to your rack."

23      A.    Correct.  Just for the simple fact that he was

24   in that area at that time, not because it was alarming.

25      Q.    Okay.  That -- that assumes that you see it,

1    correct?

2        A.   Correct.  That's the biggest issue is if your

3    focus was primarily G pod for 12 hours straight, yes,

4    you could see every interaction.  That tower deputy is

5    responsible for watching 240 inmates by himself.  So if

6    you start in G pod scanning per housing unit, all six,

7    by the time you get to M pod, this whole incident would

8    have already taken place.

9            So I just think it's unavoidable.  I mean,

10   it's -- these things happen in the jail, and -- there's

11   no way to solely monitor G pod from the tower is what

12   I'm saying.

13       Q.   Are there any -- besides monitoring those six

14   housing units, are there any other tasks that the tower

15   deputy has throughout the night shift?

16       A.   Yes.  Multiple.  Scanning inmate mail for

17   contraband, for threats of self-harm, threats against

18   staff, plus operating all of the doors for the officers,

19   the 500 door, 400 door, 401 door, plus all of the

20   housing unit doors every 15 minutes for each physical

21   check.  So, yes, there's a lot going on there.

22       Q.   Okay.  I believe you indicated previously you

23   have not spoken to Deputy Perez about this incident,

24   correct?

25       A.   I have not.  No.

1        Q.   And you weren't present for his deposition.  I

2   assume you haven't read the transcript?

3        A.   Correct.  Yes.  No, I have not.

4        Q.   I want you to assume that Deputy Perez told us

5   that he first took note of Mr. Hernandez's presence in

6   the dayroom when Mr. Hernandez was against the left-hand

7   wall, from his perspective, walking back toward his bunk

8   area.

9            And having reviewed the video a few moments

10  ago, do you have an understanding of what general time

11  frame I would be referring to?

12       A.   Yes.

13       Q.   Okay.  Assuming that that's what Deputy Perez

14  told us, and as his supervisor at the time, does that

15  give you any concern about his level of attentiveness to

16  G pod?

17       A.   No.  Because if the individual is returning to

18  the rack area where he's supposed to be, and I assume if

19  they didn't see the object in his hand, which is very

20  possible, I mean, that's not a cause for alarm.  The

21  individual is doing what he's supposed to be doing,

22  going back to his rack.

23       Q.   Okay.  Under those circumstances, would you

24  have any concern, again, as the supervisor of this

25  deputy, for example, that he didn't immediately get on

1    the intercom to send any message to Mr. Hernandez?

2         A.    No, for the simple fact, he may have not seen

3    him initially.

4         Q.    Okay.

5         A.    It all -- yeah.  If he initially observes him

6    returning to his bunk area, no, there's no reason for

7    him to intercom.

8              MR. WASHINGTON:  All right.  No further

9    questions.

10             MR. MARQUEZ:  Just -- just as a follow up.

11             **EXAMINATION BY MR. MARQUEZ**

12        Q.    If -- if we change the hypothetical a little

13   bit and we assume that you can see a broom handle but no

14   broom and the inmate is walking back towards the racks,

15   is that then a situation of concern where you'd get on

16   the intercom?

17        A.    I mean, not necessarily.  Each one of these

18   things is situational.  It's dynamic.  There's no way to

19   know what someone's intentions are.  99.9 percent of the

20   time, he's going to be sweeping his rack off.  If he

21   even saw the object in his hand at night, in the middle

22   of the night, in that kind of lighting, there's no way

23   to see that.  You know, that -- there's no way to

24   predict that, I can say.  It's dynamic.

25        Q.    Fair enough.

1          Now, just one point of emphasis.  If it were

2     just the broom handle but no broom head, is that

3     concerning?

4          A.   Yes and no.  Yes, due to the time of night,

5     and no, because it's common practice for inmates to use

6     the handle for workout equipment.  So that's standard

7     practice.  They're not supposed to do that, of course.

8     But it's jail.  Things happen.  That time of night with

9     a large object, yes, that would probably bring

10    attention.  Yes.

11         Q.   And just to clarify.  So there are times where

12    inmates will utilize the broom handle by itself as

13    workout equipment; is that correct?

14         A.   Yes.

15         Q.   Are they supposed to be doing that after

16    lights out?

17         A.   They're not supposed to be doing that at all,

18    but it happens.

19         Q.   Is it more concerning if -- if they're

20    utilizing a handle for workout purposes after lights out

21    than it would be during the day?

22         A.   It's a rule violation regardless.  If it 's

23    the middle of the night and they're working out with it,

24    that's -- I mean, not supposed to happen, but it's not

25    necessarily concerning as a threat.

1        Q.    In your opinion, is that -- is an inmate with

2   a broom handle after lights out something that you

3   should get on the intercom for and say go back to your

4   rack?

5        A.    Yes.  Yes.

6        Q.    Currently, how many correctional officers are

7   in post 22 for -- for their shift?

8        A.    One.

9        Q.    Has there ever been a time during your

10  employment at the jail in which more than one

11  correctional officer was assigned to the tower?

12       A.    The only time that happens is during a field

13  training.  On a daily basis posting, no, that never

14  happens.

15       Q.    And I'm just going to ask that these two

16  documents be marked as Exhibit 2 and 3, please.

17                 (Whereupon Exhibits 2 and 3 were marked

18                  for identification.)

19  BY MR. MARQUEZ:

20       Q.    All right.  Sergeant Behlke, I'm going to hand

21  you what's been marked as Exhibit 2.  This was provided

22  to me just before the deposition.  During our

23  off-the-record discussions, counsel indicated that it

24  may have been in the discovery responses already, but he

25  just wanted to make sure that I had them.

1              Have you seen that document before?

2       A.    I have.  Yes.  I authored it.

3       Q.    And what's the date and title of the document?

4       A.    3/7/19.

5       Q.    And is there anything about that document that

6    you want to explain or expound on?

7       A.    No.

8       Q.    There is no signature on that document.  Is

9    that -- is that normal?

10      A.    Correct.  Yes.

11      Q.    I'm going to hand you Exhibit 3.  Same

12   situation where it was handed before the -- the

13   beginning of the deposition just in case they weren't

14   already provided in discovery.

15            Do you recognize that document?

16      A.    Yes.

17      Q.    Did you author that?

18      A.    Yes, I did.

19      Q.    What's the date of it?

20      A.    3/7/19.

21      Q.    After reviewing it, is there anything that you

22   want to explain or expound on?

23      A.    No.

24      Q.    Is there anything of note in that document

25   that you want to talk about?

1      A.    No.

2            MR. MARQUEZ:  All right.  No further

3      questions.

4            COURT REPORTER:  Counsel, would you like a

5      transcripts?

6            MS. McCREARY:  No, I don't have any.

7            I do have one question about the documents

8      he's reading, though.  Where do I find those two

9      documents?

10           MR. WASHINGTON:  Well, if you get a

11     transcript, they'll be attached.  They may also be in

12     our production; but, again, I just wanted to be dealt --

13     make sure.

14           MS. McCREARY:  Okay.

15           MR. WASHINGTON:  If you'd like them sooner, I

16     can e-mail you a copy, Linda.

17           MS. McCREARY:  If they're attached, that's

18     fine.  Just so I can tell Jerry what I was listening to

19     and what was being said and what it was referring to.

20           MR. WASHINGTON:  Okay.  I -- just -- just

21     in -- just for -- they're basically -- they're two

22     memos.  One for each of the plaintiffs describing that

23     the -- that each of those inmates was transported to the

24     hospital that night.

25           MS. McCREARY:  Okay.

```
 1              MR. WASHINGTON:  Fair enough, counsel?

 2              MR. MARQUEZ:  Fair enough.

 3              MS. McCREARY:  Thank you.  I appreciate that.

 4    It's odd being the one away.

 5              COURT REPORTER:  Counsel, would you like a

 6    transcript?

 7              MR. WASHINGTON:  Yes, please.

 8              MR. MARQUEZ:  Yes, please.

 9                   (Whereupon the proceedings were concluded

10                   at 3:40 p.m.)

11                        --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      DEPONENT'S SIGNATURE

2

3           Please be advised I have read the foregoing

4     deposition, pages 1 through 63 inclusive.  I hereby

5     state there are:

6           (Check one)

7           _____ No corrections

8           _____ Corrections per attached

9

10          _____

11    JASON BEHLKE

12

13          (    ) Reading and signing was requested.

14          (    ) Reading and signing was waived.

15          ( X ) Reading and signing was not requested.

16

17          Should the signature of the witness not be

18    affixed to the deposition, the witness shall not have

19    availed himself of the opportunity to sign or the

20    signature has been waived.

21

22                      --oOo--

23

24

25
```

64

```
1                          ERRATA SHEET

2            NAME OF CASE:  CLARENCE BEAVER, ET AL. V.
                            COUNTY OF BUTTE, ET AL.
3
             DATE OF DEPOSITION:  October 28, 2021
4
             NAME OF WITNESS:  JASON BEHLKE
5
             Reason Codes:
6
                   1:  To clarify the record.
7
                   2:  To conform to the facts.
8
                   3:  To correct transcription error.
9
    Page _____ Line _____  Reason _____
10
    From _____ to _____
11
    Page _____ Line _____  Reason _____
12
    From _____ to _____
13
    Page _____ Line _____  Reason _____
14
    From _____ to _____
15
    Page _____ Line _____  Reason _____
16
    From _____ to _____
17
    Page _____ Line _____  Reason _____
18
    From _____ to _____
19
    Page _____ Line _____  Reason _____
20
    From _____ to _____
21
    Page _____ Line _____  Reason _____
22
    From _____ to _____
23

24  _____          _____
    JASON BEHLKE                      DATED
25
```

1              DECLARATION UNDER PENALTY OF PERJURY

2

3       I am the witness in the foregoing deposition.

4  I have read the foregoing deposition or have had read to

5  me the foregoing deposition, and having made such

6  changes and corrections as I desired, I certify that the

7  same is true in my own knowledge.

8       I hereby declare under penalty of perjury under the

9  laws of the State of California that the foregoing is

10  true and correct.

11      This Declaration is executed this _____ day of

12  _____, 20___, at _____, California.

13

14

15

16  _____

17  JASON BEHLKE

18

19

20

21

22

23

24

25

66

```
 1                         )
       STATE OF CALIFORNIA )
 2                         )

 3

 4        I, Kaitlyn B. Houston, Certified Shorthand Reporter

 5   No. 14170 in the State of California, duly empowered to

 6   administer oaths, do hereby certify:

 7        I am the deposition officer that stenographically

 8   reported the testimony in the foregoing deposition;

 9        Prior to being examined, the deponent was, by me,

10   first duly placed under oath;

11        The foregoing transcript if a true record of the

12   testimony given;

13        Pursuant to Rule 30(e) of the Federal Rules of

14   Civil Procedure, it was requested that the deponent

15   shall have 30 days to review the transcript; therefore,

16   any changes made by the deponent or whether or not the

17   deponent signed the transcript cannot at this time be

18   set forth.

19

20   Dated December 10, 2021.

21

22

23

24   _____
     Kaitlyn B. Houston
25   Certified Shorthand Reporter No. 14170
```

**'**

**'08** [1] - 8:21

**1**

**1** [17] - 1:18, 1:20, 3:11, 3:16, 3:19, 23:24, 24:2, 24:6, 28:7, 28:8, 29:12, 34:16, 36:17, 37:1, 40:12, 64:4, 65:6
**1-10** [1] - 1:13
**10** [1] - 67:20
**10:00** [1] - 45:16
**119** [1] - 3:12
**12** [3] - 14:20, 35:12, 56:3
**1280** [1] - 2:5
**14170** [3] - 1:25, 67:5, 67:25
**15** [3] - 18:4, 18:7, 56:20
**16** [1] - 42:7
**1600** [2] - 1:20, 2:9

**2**

**2** [10] - 2:9, 3:14, 36:17, 36:18, 48:16, 60:16, 60:17, 60:21, 65:7
**2/28** [1] - 8:21
**2/47** [1] - 50:11
**20** [3] - 9:11, 35:9, 66:12
**200** [1] - 2:14
**2008** [2] - 8:22, 23:14
**2015** [2] - 9:3, 9:4
**2017** [1] - 4:20
**2019** [24] - 4:10, 8:9, 10:5, 10:13, 12:2, 14:5, 17:16, 17:22, 20:10, 21:2, 25:15, 26:20, 26:22, 27:4, 28:2, 28:13, 29:23, 30:7, 37:19, 39:16, 40:16, 43:4, 43:16, 49:19
**2021** [4] - 1:17, 4:2, 65:3, 67:20
**21st** [1] - 9:3
**22** [6] - 30:23, 31:12, 42:23, 43:20, 48:25, 60:7
**24** [3] - 3:11, 6:21, 43:25
**24/7** [1] - 46:15
**240** [1] - 56:5
**25** [1] - 37:19

**28** [3] - 1:17, 4:2, 65:3
**2:00** [2] - 1:18, 4:2
**2:20-cv-00279-WBS-DB** [1] - 1:7
**2:53:56** [1] - 43:16
**2:54:21** [1] - 46:6
**2:54:39** [1] - 46:22
**2:55:15** [1] - 47:16
**2:55:23** [1] - 48:2
**2:55:52** [1] - 49:12
**2:56:11** [1] - 49:24
**2:56:21** [1] - 50:25
**2:57:26** [1] - 52:9

**3**

**3** [8] - 3:17, 36:18, 48:16, 60:16, 60:17, 61:11, 65:8
**3/7/19** [2] - 61:4, 61:20
**30** [6] - 7:25, 8:4, 8:6, 42:7, 45:25, 67:15
**30(e** [1] - 67:13
**32** [2] - 42:18, 42:20
**332-8110** [1] - 2:6
**345-0821** [1] - 2:10
**3:00** [1] - 10:16
**3:40** [1] - 1:18, 63:10

**4**

**4** [4] - 3:3, 3:13, 36:18, 43:11
**40** [3] - 12:17, 36:23, 42:14
**40-something** [1] - 36:23
**400** [1] - 56:19
**401** [1] - 56:19
**415** [3] - 16:22, 17:1, 31:15
**43** [1] - 3:13
**44** [3] - 29:12, 29:16, 30:7
**47** [2] - 36:25, 37:18

**5**

**5** [2] - 34:16, 34:20
**5-0** [1] - 50:14
**50** [3] - 40:11, 50:14, 50:17
**50-minute** [1] - 50:11
**500** [1] - 56:19
**530** [2] - 2:6, 2:10
**54** [1] - 3:4
**58** [1] - 3:5
**5:00** [1] - 45:18

**6**

**60** [3] - 3:14, 3:17, 12:1
**600** [1] - 39:4
**63** [1] - 64:4
**641** [2] - 2:14
**67** [1] - 1:18
**6th** [4] - 10:12, 29:23, 30:7, 40:16

**7**

**7** [12] - 4:10, 8:9, 8:18, 12:2, 14:5, 17:16, 17:22, 21:2, 39:16, 43:16, 43:25, 49:19
**7:00** [4] - 10:14, 43:3
**7th** [2] - 10:12, 30:2

**9**

**95825** [2] - 2:14
**95928** [2] - 2:5, 2:10
**95961** [1] - 8:18
**99.9** [1] - 58:19
**9th** [2] - 2:5

**A**

**a..** [1] - 48:12
**a.m** [5] - 10:14, 10:16, 43:3, 43:16, 45:18
**ability** [1] - 6:22
**able** [4] - 22:2, 26:16, 50:9, 52:3
**abnormal** [2] - 12:5, 47:8
**absolutely** [2] - 48:15, 48:17
**access** [2] - 51:10, 51:21
**according** [2] - 40:22, 41:13
**accurate** [1] - 42:19
**accurately** [1] - 55:16
**act** [4] - 38:16, 38:19, 39:7, 39:10
**acting** [2] - 9:22, 14:6
**action** [1] - 11:1
**actions** [1] - 36:9
**activate** [1] - 29:10
**activities** [1] - 39:18
**activity** [2] - 46:15, 47:7
**addition** [1] - 50:16
**additional** [2] - 9:20, 40:9
**address** [1] - 8:17
**admin** [1] - 26:3

**administer** [1] - 67:6
**administrative** [1] - 42:5
**Adrian** [1] - 37:14
**advised** [1] - 64:3
**affect** [1] - 6:21
**affixed** [1] - 64:18
**aftermath** [1] - 54:18
**afternoon** [1] - 4:7
**afterwards** [1] - 54:23
**ago** [12] - 7:25, 8:6, 23:22, 25:19, 25:20, 27:7, 27:12, 27:13, 27:23, 27:24, 45:25, 57:10
**agree** [1] - 30:11
**Agurgkis** [1] - 24:1
**ahead** [2] - 6:17, 32:13
**AL** [2] - 65:2, 65:2
**alarm** [1] - 57:20
**alarming** [2] - 47:8, 55:24
**alcohol** [1] - 6:20
**alleged** [1] - 16:11
**allow** [2] - 6:2, 6:15
**altercation** [4] - 10:15, 10:23, 11:2, 17:2
**ambient** [1] - 21:21
**ankle** [1] - 5:1
**announced** [1] - 11:14
**answer** [7] - 5:21, 6:4, 6:10, 6:17, 20:2, 20:3, 38:25
**answered** [1] - 32:12
**answers** [1] - 5:16
**anyway** [2] - 5:6, 42:25
**apologize** [1] - 33:19
**apology** [1] - 33:19
**appeared** [2] - 21:4, 55:12
**appearing** [1] - 2:12
**appreciate** [1] - 63:3
**appropriate** [1] - 47:6
**area** [15] - 9:14, 12:7, 36:12, 46:13, 47:21, 47:23, 48:16, 49:21, 51:22, 53:12, 53:17, 55:24, 57:8, 57:18, 58:6
**areas** [6] - 21:24, 22:3, 22:4, 22:10, 50:9
**argumentative** [1] - 32:12
**arrest** [1] - 4:23
**arriving** [1] - 17:3
**assaulted** [2] - 33:7, 33:8
**assess** [1] - 12:10

**assessed** [3] - 11:20, 12:21, 19:23
**assessment** [1] - 12:23
**assign** [3] - 13:9, 14:8, 14:11
**assigned** [1] - 60:11
**assignment** [2] - 34:21, 49:19
**assume** [10] - 6:10, 13:4, 30:17, 35:25, 36:8, 39:22, 57:2, 57:4, 57:18, 58:13
**assumes** [1] - 55:25
**assuming** [3] - 21:10, 55:18, 57:13
**attached** [4] - 55:13, 62:11, 62:17, 64:8
**attacker** [1] - 16:11
**attempts** [1] - 39:12
**attention** [3] - 20:22, 34:16, 59:10
**attentiveness** [1] - 57:15
**attorney** [2] - 4:8, 6:13
**attorneys** [1] - 7:3
**author** [2] - 14:15, 61:17
**authored** [2] - 7:14, 61:2
**automatically** [1] - 41:7
**available** [7] - 23:7, 23:15, 23:16, 24:22, 24:23, 25:22, 27:3
**availed** [1] - 64:19
**Avenue** [1] - 2:14
**avoid** [2] - 41:23, 41:24
**aware** [9] - 7:1, 10:15, 10:19, 17:24, 18:18, 18:22, 26:7, 28:21, 42:25

**B**

**barricading** [1] - 26:15
**base** [1] - 28:16
**based** [1] - 38:18
**basic** [2] - 9:7, 20:19
**basis** [4] - 9:11, 25:24, 27:15, 60:13
**Bates** [9] - 24:6, 28:8, 29:11, 34:16, 34:20, 35:12, 36:25, 37:18, 40:11
**BEAVER** [2] - 1:4, 65:2
**Beaver** [9] - 3:19, 4:9,

1

11:6, 13:15, 15:4, 16:6, 16:13, 34:12, 54:13
**become** [2] - 10:19, 25:5
**bed** [1] - 41:17
**beginning** [1] - 61:13
**behavior** [4] - 38:6, 46:17, 47:5, 47:9
**BEHLKE** [7] - 1:11, 1:16, 4:3, 64:11, 65:4, 65:24, 66:17
**Behlke** [1] - 60:20
**belated** [1] - 18:11
**belatedly** [1] - 31:1
**belief** [1] - 28:6
**belongings** [1] - 41:2
**bending** [1] - 47:20
**best** [3] - 18:13, 23:21, 42:13
**better** [1] - 21:18
**between** [3] - 10:16, 11:6, 25:15
**biggest** [1] - 56:2
**bipolar** [1] - 18:20
**bit** [1] - 58:13
**black** [1] - 49:13
**blood** [1] - 12:25
**blue** [2] - 47:17, 47:21
**bodies** [1] - 22:14
**body** [26] - 24:11, 24:15, 24:18, 25:7, 25:11, 25:20, 25:25, 26:5, 26:11, 26:19, 26:22, 27:2, 27:8, 27:12, 27:18, 27:21, 27:24, 28:3, 28:7, 28:11, 28:13, 28:14, 28:20, 29:2, 29:6
**booking** [3] - 36:17, 36:18
**bookings** [1] - 26:13
**Bossen** [1] - 37:9
**bossen's** [1] - 37:13
**bottles** [2] - 44:12, 53:3
**bottom** [6] - 22:18, 22:19, 22:20, 24:10, 29:16, 43:15
**box** [1] - 22:13
**break** [2] - 53:22, 53:25
**brighter** [2] - 49:10
**bring** [1] - 59:9
**broken** [1] - 25:3
**broom** [12] - 21:3, 21:5, 45:8, 45:11, 45:13, 48:19, 58:13, 58:14, 59:2, 59:12, 60:2

**brush** [2] - 45:8, 45:13
**bucket** [2] - 44:12, 45:7
**bunk** [9] - 48:11, 48:14, 49:18, 49:21, 51:5, 51:22, 53:12, 57:7, 58:6
**but..** [1] - 13:22
**Butte** [6] - 3:11, 3:14, 3:17, 8:16, 37:2, 40:12
**BUTTE** [3] - 1:7, 65:2
**BY** [18] - 1:23, 2:4, 2:9, 2:13, 4:6, 5:3, 11:5, 18:17, 24:4, 29:21, 31:6, 32:16, 36:3, 43:13, 50:15, 54:11, 58:11, 60:19

## C

**CALIFORNIA** [4] - 1:2, 1:13, 4:1, 67:1
**California** [8] - 1:21, 2:5, 2:10, 2:14, 8:18, 66:9, 66:12, 67:5
**cam** [4] - 28:11, 28:13, 28:20, 29:2
**camera** [20] - 21:20, 24:11, 24:16, 24:19, 26:5, 26:11, 26:19, 27:18, 27:21, 27:25, 28:7, 28:16, 29:7, 29:10, 51:7, 51:9, 51:13, 51:18, 51:19, 52:6
**cameras** [14] - 25:1, 25:11, 25:20, 25:25, 26:22, 27:3, 27:8, 27:12, 28:3, 28:14, 29:2, 42:23, 49:16, 51:8
**cams** [1] - 25:7
**cancelled** [1] - 8:1
**cannot** [2] - 51:22, 67:17
**cans** [3] - 44:5, 44:6, 45:21
**Capacity** [4] - 1:9, 1:10, 1:11, 1:12
**captain** [2] - 28:24, 28:25
**capture** [1] - 49:17
**care** [2] - 54:25, 55:3
**career** [1] - 35:8
**CASE** [1] - 65:2
**case** [8] - 4:22, 4:24, 14:19, 14:20, 16:20, 28:12, 33:7, 61:13
**Case** [1] - 1:6

**caseload** [1] - 5:1
**caught** [1] - 20:22
**cell** [2] - 26:15, 36:13
**cells** [3] - 18:8, 36:21, 42:5
**certain** [6] - 9:14, 27:1, 33:6, 36:7, 38:16, 38:23
**certainly** [1] - 18:14
**Certified** [1] - 67:4
**certified** [1] - 67:25
**certify** [2] - 66:6, 67:6
**change** [2] - 52:20, 58:12
**changes** [3] - 9:1, 66:6, 67:16
**charge** [4] - 13:19, 13:24, 28:19, 34:24
**check** [4] - 18:4, 50:19, 56:21, 64:6
**checking** [1] - 18:6
**checkmark** [2] - 24:11, 28:7
**checks** [2] - 41:4, 50:11
**CHICO** [1] - 4:1
**Chico** [3] - 1:21, 2:5, 2:10
**chow** [1] - 45:18
**circumstances** [2] - 26:10, 57:23
**Civil** [1] - 67:14
**claims** [1] - 26:14
**CLARENCE** [2] - 1:4, 65:2
**Clarence** [3] - 3:19, 4:9, 15:4
**clarification** [3] - 11:4, 34:6, 50:13
**clarify** [4] - 11:6, 27:2, 59:11, 65:6
**classification** [21] - 19:15, 19:20, 20:3, 20:6, 20:7, 20:10, 34:18, 34:20, 34:24, 35:4, 35:7, 35:18, 38:6, 38:10, 39:22, 39:25, 40:1, 40:5, 40:9, 42:3, 49:23
**classification's** [1] - 42:3
**classify** [1] - 19:17
**cleaning** [10] - 43:22, 44:10, 44:22, 45:4, 47:6, 47:25, 48:11, 52:25, 53:9, 53:11
**clear** [2] - 12:19, 40:5
**clearly** [2] - 12:11, 12:24
**clips** [1] - 25:3

**closely** [1] - 39:2
**closer** [2] - 49:8, 49:10
**closet** [1] - 53:6
**clothing** [1] - 19:16
**cloud** [3] - 28:16, 28:17, 28:20
**Codes** [1] - 65:5
**coming** [4] - 19:11, 19:18, 19:24, 22:21
**commander** [1] - 9:22
**commits** [1] - 39:6
**common** [11] - 5:19, 26:13, 28:15, 29:4, 29:6, 35:22, 41:22, 44:4, 45:19, 46:14, 59:5
**comparison** [1] - 49:9
**complaints** [1] - 21:23
**completed** [1] - 17:8
**completely** [1] - 6:3
**concern** [3] - 57:15, 57:24, 58:15
**concerning** [7] - 46:17, 47:5, 48:9, 50:3, 59:3, 59:19, 59:25
**concerns** [2] - 21:23, 22:2
**concluded** [1] - 63:9
**concurred** [1] - 20:21
**conduct** [4] - 13:10, 14:8, 37:25, 39:21
**conducted** [1] - 39:17
**conducting** [2] - 16:15, 32:3
**confined** [1] - 53:12
**conform** [1] - 65:7
**confuse** [1] - 6:9
**conjunction** [1] - 29:3
**constant** [1] - 47:7
**consumed** [1] - 6:20
**contact** [3] - 17:18, 41:5, 42:2
**contain** [1] - 18:14
**content** [1] - 28:18
**context** [1] - 38:14
**continue** [1] - 18:15
**continuous** [1] - 50:11
**contraband** [1] - 56:17
**conversation** [4] - 15:24, 16:1, 16:15, 16:17
**convex** [2] - 51:14, 51:15
**copy** [3] - 23:10, 23:18, 62:16
**corner** [3] - 43:16, 46:24, 47:18

**correct** [65] - 7:19, 8:10, 11:12, 12:21, 12:22, 16:25, 20:13, 21:13, 22:23, 22:24, 27:10, 28:10, 29:23, 30:3, 30:8, 30:9, 30:16, 30:19, 30:23, 30:24, 31:10, 31:13, 31:15, 33:2, 33:12, 34:13, 34:14, 34:22, 34:25, 36:13, 37:3, 37:4, 37:19, 38:1, 40:17, 40:23, 41:14, 41:18, 41:20, 42:21, 43:17, 43:21, 46:1, 46:10, 47:19, 50:20, 50:21, 51:16, 52:2, 52:7, 52:11, 54:19, 55:4, 55:14, 55:15, 55:23, 56:1, 56:2, 56:24, 57:3, 59:13, 61:10, 65:8, 66:10
**Correctional** [5] - 15:14, 15:17, 17:8, 20:13, 31:20
**CORRECTIONAL** [1] - 1:12
**correctional** [20] - 8:24, 9:2, 11:22, 13:8, 14:10, 14:12, 14:21, 26:10, 28:3, 30:15, 31:8, 31:18, 32:25, 33:5, 34:1, 37:8, 50:19, 52:10, 60:6, 60:11
**Corrections** [1] - 64:8
**corrections** [4] - 29:22, 37:2, 64:7, 66:6
**corridor** [1] - 53:7
**Counsel** [2] - 62:4, 63:5
**counsel** [5] - 54:1, 54:12, 55:10, 60:23, 63:1
**count** [1] - 42:11
**county** [2] - 4:10, 39:5
**COUNTY** [3] - 1:7, 1:8, 65:2
**County** [6] - 3:11, 3:14, 3:17, 8:16, 37:2, 40:12
**couple** [2] - 5:4, 54:12
**course** [7] - 19:6, 22:5, 24:16, 32:21, 33:8, 59:7
**Court** [1] - 53:24
**court** [4] - 4:14, 5:10, 5:14, 43:8
**COURT** [3] - 1:1, 62:4,

63:5
coworkers [1] - 7:6
created [1] - 20:13
criminal [4] - 7:13, 7:16, 14:15, 29:8
criteria [1] - 36:7
critical [1] - 39:12
CSR [1] - 1:25
current [3] - 8:15, 9:6, 43:1
custody [2] - 35:13, 39:11
cut [1] - 5:1

**D**

DA's [1] - 14:16
daily [6] - 9:11, 25:24, 26:13, 27:17, 45:12, 60:13
dark [1] - 22:5
Darrell [1] - 29:1
database [1] - 28:17
DATE [1] - 65:3
date [13] - 25:10, 27:1, 27:6, 29:24, 29:25, 30:7, 30:9, 32:20, 37:18, 40:16, 61:3, 61:19
DATED [1] - 65:24
Dated [1] - 67:20
David [1] - 35:3
dayroom [5] - 41:3, 51:21, 52:1, 53:13, 57:6
days [7] - 7:25, 8:4, 8:6, 10:12, 43:25, 45:25, 67:15
dealt [1] - 62:12
deaths [1] - 39:11
debts [1] - 38:22
December [1] - 67:20
DECLARATION [1] - 66:1
Declaration [1] - 66:11
declare [1] - 66:8
Defendants [3] - 1:15, 2:7, 2:12
defendants [2] - 10:17, 11:1
delta [1] - 30:22
depicts [2] - 24:17, 37:24
deponent [4] - 67:9, 67:14, 67:16, 67:17
DEPONENTS [1] - 64:1
deposed [1] - 4:12
DEPOSITION [2] -

1:16, 65:3
deposition [18] - 4:11, 7:2, 7:7, 7:9, 7:21, 8:1, 23:25, 24:8, 57:1, 60:22, 61:13, 64:4, 64:18, 66:3, 66:4, 66:5, 67:7, 67:8
deputies [8] - 10:22, 25:24, 27:15, 27:16, 33:11, 34:1, 41:4, 50:10
DEPUTY [2] - 1:9, 1:10
Deputy [14] - 7:14, 10:21, 11:14, 14:10, 30:21, 31:4, 31:8, 31:14, 31:17, 31:21, 32:8, 56:23, 57:4, 57:13
deputy [10] - 7:17, 8:24, 9:25, 16:15, 28:17, 30:18, 33:7, 56:4, 56:15, 57:25
deputy's [1] - 18:3
describing [1] - 62:22
Description [1] - 3:10
designated [2] - 44:2, 44:15
designation [1] - 45:1
desired [1] - 66:6
determine [2] - 19:2, 21:7
determined [1] - 41:10
determines [1] - 19:13
diagnosed [1] - 18:20
dictate [1] - 13:17
different [4] - 13:22, 16:12, 16:18, 38:19
difficult [4] - 21:25, 22:11, 22:16, 23:2
digitally [1] - 23:7
dim [1] - 21:12
direct [1] - 34:15
directs [1] - 6:18
disciplined [1] - 10:8
discovery [3] - 43:10, 60:24, 61:14
discretion [3] - 26:2, 26:5, 41:11
discussed [1] - 5:5
Discussion [1] - 54:3
discussions [1] - 60:23
disinfectant [3] - 44:12, 45:7, 45:8
disorder [1] - 18:20
disorders [1] - 18:24
displaying [1] - 36:9
disruptive [3] - 37:25, 39:3, 39:5

DISTRICT [2] - 1:1, 1:2
disturbance [1] - 38:5
division [2] - 29:22, 37:2
document [21] - 23:23, 29:22, 30:12, 31:2, 31:4, 34:17, 34:21, 35:13, 37:1, 37:5, 37:24, 38:3, 40:22, 41:13, 41:16, 61:1, 61:3, 61:5, 61:8, 61:15, 61:24
Document [1] - 3:12
documentation [2] - 35:6, 35:15
documents [7] - 7:10, 7:20, 7:24, 24:7, 60:16, 62:7, 62:9
DOE [1] - 1:13
done [5] - 15:2, 24:18, 29:13, 32:17, 40:19
door [6] - 41:3, 51:10, 51:22, 56:19
doors [2] - 56:18, 56:20
down [2] - 5:14, 55:16
download [1] - 28:18
downward [1] - 52:1
drawer [1] - 48:11
due [10] - 15:11, 21:5, 21:6, 21:9, 22:13, 22:14, 26:24, 38:5, 59:4
duly [3] - 4:4, 67:5, 67:10
during [9] - 9:21, 10:7, 24:16, 29:5, 46:12, 59:21, 60:9, 60:12, 60:22
duties [2] - 9:6, 27:17
duty [4] - 26:13, 34:19, 35:22, 40:2
dynamic [2] - 58:18, 58:24

**E**

e-mail [2] - 62:16
easier [2] - 21:14, 49:1
EASTERN [1] - 1:2
effect [4] - 42:16, 48:18, 54:20, 55:6
either [4] - 42:16, 48:18, 54:20, 55:6
Elvis [1] - 24:15
emphasis [1] - 59:1
employed [3] - 14:4, 23:4, 37:15
employee [2] - 23:5, 23:9
employees [2] - 9:16,

9:18
employer [1] - 8:15
employment [2] - 10:7, 60:10
empowered [1] - 67:5
end [4] - 15:1, 18:3, 38:3
ensure [1] - 18:4
ensures [1] - 50:22
enter [1] - 53:13
entered [3] - 12:2, 12:8, 52:11
entirety [1] - 50:21
entrance [2] - 52:4, 53:19
equipment [2] - 59:6, 59:13
ERRATA [1] - 65:1
error [4] - 24:18, 28:8, 28:10, 65:8
escaped [1] - 5:2
escorted [1] - 38:4
ESQ [3] - 2:4, 2:9, 2:13
Esteban [2] - 10:1, 30:18
estimate [4] - 23:21, 25:19, 42:13, 42:20
ET [2] - 65:2, 65:2
evicting [2] - 40:23, 40:25
evidence [1] - 18:13
exact [1] - 27:5
exactly [1] - 32:15
EXAMINATION [3] - 4:6, 54:11, 58:11
EXAMINATIONS [1] - 3:1
Examinations [1] - 3:2
examined [2] - 4:4, 67:9
example [1] - 57:25
examples [3] - 26:9, 26:18, 39:9
executed [1] - 66:11
Exhibit [15] - 3:11, 3:13, 3:14, 3:17, 23:24, 24:2, 28:7, 29:12, 34:16, 37:1, 40:12, 43:11, 60:16, 60:21, 61:11
Exhibits [1] - 60:17
EXHIBITS [1] - 3:9
exit [1] - 52:4
experience [2] - 38:18, 39:1
explain [3] - 25:2, 61:6, 61:22
expound [2] - 61:6, 61:22

expressed [1] - 21:24
eye [2] - 21:15, 21:21
eyes [2] - 21:19, 23:1

**F**

faces [1] - 51:10
facility [1] - 28:15
facing [2] - 51:9, 51:21
fact [3] - 39:4, 55:23, 58:2
factors [1] - 22:17
facts [1] - 65:7
fair [7] - 27:9, 31:12, 42:20, 54:18, 58:25, 63:1, 63:2
familiar [5] - 17:16, 34:17, 35:19, 37:6, 37:8
family [1] - 38:22
far [2] - 18:3, 32:18
fashion [1] - 15:3
fear [1] - 41:5
February [2] - 37:19, 40:16
Federal [1] - 67:13
fellow [1] - 7:6
female [2] - 42:8, 42:17
few [1] - 57:9
field [1] - 60:12
file [2] - 39:23, 40:5
files [3] - 39:25, 40:6, 40:9
filled [1] - 44:13
fine [2] - 54:1, 62:18
finish [2] - 6:3, 6:4
first [22] - 4:4, 7:25, 8:19, 8:22, 10:19, 11:8, 11:11, 11:21, 12:2, 12:3, 16:21, 24:6, 25:5, 25:7, 27:3, 27:21, 28:9, 28:25, 35:2, 37:13, 57:5, 67:10
five [2] - 33:4, 49:4
floor [2] - 12:25, 42:11
focus [2] - 49:5, 56:3
folders [1] - 39:24
follow [3] - 19:6, 54:10, 58:10
follows [1] - 4:5
footage [13] - 8:8, 21:11, 21:15, 21:16, 22:3, 22:11, 28:11, 28:13, 28:20, 31:24, 32:20, 44:7, 48:19
force [2] - 26:14, 26:16

foregoing [7] - 64:3, 66:3, 66:4, 66:5, 66:9, 67:8, 67:11
FORENSIC [1] - 1:13
form [1] - 35:20
forth [2] - 45:13, 67:18
forward [1] - 6:24
Foster [2] - 14:3, 14:4
fountain [3] - 45:22, 53:14, 53:15
four [2] - 27:6, 28:14
frame [3] - 50:1, 55:14, 57:11
free [1] - 18:14
frequency [3] - 25:23, 27:14, 28:5
Friday [2] - 43:2, 43:3
friends [1] - 38:22
frivolous [1] - 41:9
Fulton [1] - 2:14
function [2] - 27:8, 34:10

**G**

garments [1] - 18:9
gather [1] - 41:2
general [5] - 16:1, 19:17, 22:19, 49:21, 57:10
generally [1] - 4:21
generate [1] - 17:9
gillick [1] - 8:18
gist [1] - 55:17
given [4] - 14:24, 18:9, 33:9, 67:12
gotcha [1] - 29:18
ground [1] - 5:4
GROUP [1] - 1:14

**H**

hand [15] - 22:18, 22:20, 23:23, 24:10, 43:16, 44:8, 46:8, 46:24, 47:18, 48:8, 57:6, 57:19, 58:21, 60:20, 61:11
handbook [4] - 23:5, 23:8, 23:9, 23:11
handed [1] - 61:12
handle [10] - 45:9, 45:10, 47:3, 55:12, 58:13, 59:2, 59:6, 59:12, 59:20, 60:2
handles [1] - 45:12
hands [1] - 48:6
hard [10] - 6:2, 15:2, 15:13, 21:7, 23:10, 23:18, 31:23, 39:7,

48:21, 48:24
harder [2] - 49:1, 49:3
harm [1] - 56:17
harming [1] - 36:9
head [10] - 5:19, 5:20, 20:5, 42:19, 45:9, 45:11, 45:14, 48:19, 59:2
heads [1] - 53:4
health [3] - 18:23, 19:6, 19:13
hear [4] - 6:15, 16:22, 22:7
heard [7] - 11:9, 11:12, 11:17, 11:24, 16:21, 38:12, 38:14
helpful [2] - 31:21, 32:7
hereby [3] - 64:4, 66:8, 67:6
Hernandez [21] - 11:7, 16:8, 16:17, 17:17, 17:21, 21:2, 37:24, 38:4, 39:17, 40:22, 41:13, 46:8, 46:24, 47:20, 48:3, 49:2, 49:25, 50:24, 55:12, 57:6, 58:1
Hernandez's [5] - 39:21, 46:17, 48:20, 49:18, 57:5
highly [2] - 39:7, 51:25
himself [4] - 40:23, 40:25, 56:5, 64:19
hired [1] - 8:22
history [1] - 39:21
hit [7] - 45:23, 46:21, 47:15, 47:16, 49:11, 49:24
holding [2] - 36:17
HONEA [1] - 1:8
hospital [12] - 7:15, 13:12, 16:3, 33:11, 33:25, 34:2, 34:5, 34:9, 39:13, 54:24, 55:2, 62:24
hour [2] - 14:20, 53:22
hours [5] - 6:21, 10:13, 14:20, 43:25, 56:3
house [1] - 4:23
housed [7] - 18:8, 19:15, 19:16, 38:15, 41:1, 42:17, 44:23
housing [28] - 11:19, 12:7, 12:17, 19:7, 19:17, 21:7, 22:14, 34:20, 36:12, 36:14, 38:6, 38:10, 38:23,

40:23, 41:2, 41:17, 42:4, 42:16, 49:4, 50:12, 50:21, 51:10, 51:21, 51:23, 55:20, 56:6, 56:14, 56:20
Houston [3] - 1:24, 67:4, 67:24
Hovy [1] - 28:24
Hovy's [1] - 28:25
Humboldt [2] - 1:20, 2:9
hundreds [1] - 15:12
hurt [1] - 18:10
hypothetical [1] - 58:12

**I**

I.. [1] - 35:22
idea [5] - 14:21, 35:11, 37:15, 39:19, 49:22
identification [2] - 24:3, 43:12, 60:18
identify [1] - 33:6
image [1] - 49:8
immediate [1] - 54:17
immediately [1] - 57:25
impediment [1] - 33:18
implementation [1] - 27:5
implements [1] - 47:4
in-custody [2] - 35:13, 39:11
inception [1] - 26:6
incident [36] - 4:10, 7:13, 7:16, 8:7, 10:20, 11:9, 11:11, 12:6, 13:20, 14:5, 15:5, 15:21, 15:25, 16:9, 16:21, 17:4, 17:5, 29:23, 30:2, 30:6, 30:10, 30:16, 30:21, 31:3, 31:9, 32:21, 33:12, 37:3, 37:21, 48:23, 52:22, 54:14, 54:18, 54:22, 56:7, 56:23
incidents [17] - 17:20, 29:8, 39:13
included [2] - 28:11, 33:4
includes [2] - 30:18, 37:18
inclusive [1] - 64:4
incorrect [2] - 29:24, 30:1
incurs [1] - 9:23
INDEX [2] - 3:1, 3:9

indicated [2] - 56:22, 60:23
indicates [2] - 35:10, 41:16
indicating) [1] - 53:16
Individual [4] - 1:9, 1:10, 1:11, 1:12
individual [8] - 13:12, 15:13, 29:10, 38:24, 39:8, 41:1, 57:17, 57:21
individuals [2] - 54:21, 55:6
information [3] - 17:5, 28:23, 28:24
infrastructure [2] - 25:1, 25:14
initial [1] - 8:23
injured [2] - 12:24, 33:20
injuries [3] - 12:11, 13:1, 39:13
injury [1] - 13:18
inmate [14] - 19:1, 19:11, 19:18, 19:23, 38:18, 38:19, 39:8, 45:10, 46:12, 48:13, 50:22, 56:16, 58:14, 60:1
inmates [20] - 12:18, 17:25, 18:19, 18:23, 34:2, 34:4, 38:15, 39:2, 39:5, 39:25, 40:7, 44:23, 45:2, 45:19, 49:23, 53:9, 56:5, 59:5, 59:12, 62:23
inmates' [1] - 22:14
inside [2] - 42:23, 42:24
instances [1] - 26:10
instruct [1] - 13:11
instructed [1] - 13:13
intentions [1] - 58:19
interaction [2] - 15:13, 56:4
interactions [2] - 15:12, 26:25
intercom [1] - 55:20, 58:1, 58:7, 58:16, 60:3
Interdepartmental [3] - 3:15, 3:18, 40:13
interject [3] - 10:24, 18:12, 30:25
interview [5] - 13:7, 15:17, 32:4, 32:25, 41:19
interviewed [3] - 31:17, 32:18, 32:22

interviewing [2] - 31:21, 33:5
intranet [1] - 23:17
investigating [4] - 32:2, 32:8, 32:25, 33:4
investigation [14] - 13:10, 14:9, 14:12, 14:22, 14:25, 15:18, 16:16, 17:9, 24:16, 29:3, 31:18, 31:22, 32:3, 33:3
investigations [1] - 32:17
involved [5] - 11:1, 13:7, 14:13, 32:5, 32:21
issue [3] - 25:5, 26:3, 56:2
issued [1] - 19:16
issues [2] - 24:25, 25:18
itself [2] - 36:8, 59:12

**J**

jail [42] - 4:10, 7:6, 8:20, 9:7, 9:13, 9:14, 9:15, 9:24, 10:7, 14:5, 17:24, 18:19, 18:22, 19:16, 23:4, 23:7, 23:8, 23:10, 25:8, 25:11, 25:21, 26:11, 26:20, 26:23, 27:3, 27:13, 27:17, 27:19, 27:22, 27:25, 29:3, 36:12, 39:1, 39:5, 39:21, 40:7, 41:22, 45:5, 46:14, 56:10, 59:8, 60:10
jail-issued [1] - 19:16
janitorial [1] - 53:6
JASON [6] - 1:16, 4:3, 64:11, 65:4, 65:24, 66:17
JEROME [1] - 2:13
Jerry [1] - 62:18
job [1] - 9:6
JOHN [1] - 1:12
Joseph [3] - 3:16, 4:9, 15:21
JOSEPH [1] - 1:4

**K**

Kaitlyn [3] - 1:24, 67:4, 67:24
kept [4] - 44:3, 47:23, 52:24, 53:5
kind [2] - 38:24, 58:22

knowing [2] - 16:19, 48:22
knowledge [2] - 47:24, 66:7
known [3] - 29:9, 39:7
KORY [1] - 1:8

**L**

lack [2] - 41:17
large [1] - 59:9
last [2] - 7:23, 23:19
LAW [2] - 2:4, 2:13
laws [1] - 66:9
layout [1] - 22:13
lead [1] - 20:5
learn [1] - 20:17
learned [1] - 11:11
left [8] - 22:18, 22:20, 24:10, 43:23, 46:8, 48:3, 52:25, 57:6
left-hand [2] - 22:18, 22:20, 57:6
less [1] - 12:1
level [1] - 57:15
lieutenant [1] - 24:1
light [2] - 21:21, 22:5
lighting [3] - 21:5, 21:9, 58:22
lights [11] - 12:5, 21:10, 21:12, 45:15, 45:17, 45:20, 53:9, 53:11, 59:16, 59:20, 60:2
likely [2] - 16:25, 26:16
LINDA [1] - 2:13
Linda [2] - 54:6, 62:16
Line [7] - 65:9, 65:11, 65:13, 65:15, 65:17, 65:19, 65:21
line [1] - 52:17
list [1] - 36:16
listed [2] - 30:16, 39:18
listening [1] - 62:18
lists [1] - 31:2
LLC [1] - 1:13
located [1] - 53:15
location [2] - 38:16, 44:2
log [6] - 19:8, 28:16, 28:17, 52:24, 53:2, 53:5
log-in [1] - 28:16
look [6] - 21:17, 24:5, 29:13, 36:24, 46:2, 49:8
looking [9] - 22:22, 22:25, 30:12, 43:20,

44:7, 48:4, 49:7, 50:8, 52:19
low [1] - 28:4
lower [8] - 12:7, 15:1, 36:19, 44:7, 46:8, 46:24, 47:17, 53:20

**M**

Madam [1] - 53:24
mail [2] - 56:16, 62:16
main [2] - 43:9, 44:7
maintain [1] - 40:8
maintained [1] - 40:6
maintaining [1] - 28:19
maintenance [1] - 52:24
male [2] - 42:9, 42:17
males [1] - 42:15
man [1] - 47:13
management [5] - 13:16, 13:20, 13:25, 35:23, 36:1
mandatory [2] - 25:23, 26:7
manipulation [2] - 38:5, 38:10
March [17] - 4:10, 8:9, 10:5, 10:12, 12:2, 14:5, 17:16, 17:22, 21:2, 26:22, 29:23, 30:7, 39:16, 43:4, 43:16, 49:19
mark [1] - 43:9
marked [7] - 23:24, 23:25, 24:2, 43:11, 60:16, 60:17, 60:21
Marquez [1] - 4:8
MARQUEZ [23] - 2:4, 2:4, 4:6, 5:3, 11:3, 11:5, 18:17, 24:4, 29:21, 31:6, 32:16, 36:3, 43:13, 50:15, 53:21, 53:24, 54:4, 58:10, 58:11, 60:19, 62:2, 63:2, 63:8
MARQUEZ.................
........................ [2] - 3:3, 3:5
matter [1] - 10:17
McCREARY [7] - 2:13, 54:8, 62:6, 62:14, 62:17, 62:25, 63:3
mean [26] - 12:16, 14:19, 15:2, 15:11, 16:14, 17:1, 24:15, 31:11, 31:23, 32:5, 39:14, 40:25, 42:18, 45:21, 47:7, 48:10,

48:11, 50:5, 52:8, 53:11, 56:9, 57:20, 58:17, 59:24
means [6] - 12:17, 25:2, 35:9, 38:10, 39:10, 50:7
MEDICAL [1] - 1:14
medical [10] - 12:12, 12:14, 13:10, 13:13, 13:16, 13:19, 13:23, 13:24, 34:3, 42:1
medications [1] - 6:20
mel [1] - 20:7
Mel [2] - 20:9, 34:25
Mel's [1] - 35:2
members [1] - 38:22
Memorandum [3] - 3:15, 3:18, 40:13
memory [1] - 10:21
memos [2] - 7:15, 62:22
mental [3] - 18:23, 19:5, 19:13
mention [1] - 49:4
mentioned [2] - 25:14
mentioning [1] - 33:10
message [1] - 58:1
middle [5] - 50:5, 51:1, 53:18, 58:21, 59:23
might [1] - 5:20
mind [1] - 17:13
minus [1] - 9:12
minutes [4] - 18:4, 18:7, 50:17, 56:20
Miranda [2] - 16:2, 29:5
Mirandize [1] - 14:14
Mirandized [1] - 32:22
mirror [2] - 51:14, 51:15
misconduct [1] - 26:14
misreading [1] - 31:5
misstatement [1] - 10:25
misstates [2] - 31:1, 31:2
misunderstood [1] - 34:7
moments [1] - 57:9
Monday [1] - 43:3
monitor [9] - 5:1, 17:25, 21:19, 21:20, 21:25, 39:2, 42:24, 50:12, 56:11
monitoring [4] - 18:19, 18:23, 19:8, 56:13
months [6] - 23:22,

25:19, 25:20, 27:7, 27:12, 27:13
mop [5] - 44:12, 45:7, 47:3, 48:19, 53:4
morning [2] - 45:18, 48:16
most [1] - 5:5
motion [2] - 49:16, 49:17
mounted [1] - 51:25
move [2] - 6:5, 6:24
moved [1] - 37:25
movement [1] - 51:1
MR [39] - 3:3, 3:4, 3:5, 4:6, 5:3, 10:24, 11:3, 11:5, 18:11, 18:17, 24:4, 29:16, 29:19, 29:21, 30:25, 31:6, 32:11, 32:16, 36:2, 36:3, 43:13, 50:15, 53:21, 53:24, 54:4, 54:9, 54:11, 58:8, 58:10, 58:11, 60:19, 62:2, 62:10, 62:15, 62:20, 63:1, 63:2, 63:7, 63:8
MS [6] - 54:8, 62:6, 62:14, 62:17, 62:25, 63:3
multiple [2] - 39:12, 56:16
must [1] - 30:9
muted [1] - 54:8
myriad [2] - 38:23, 39:14

**N**

naked [1] - 21:15
NAME [2] - 65:2, 65:4
name [5] - 4:7, 13:21, 28:25, 35:2, 37:13
names [2] - 30:15, 30:18
nature [3] - 4:21, 16:4, 53:4
near [2] - 51:5, 53:19
necessarily [7] - 16:14, 16:19, 35:5, 44:4, 48:10, 58:17, 59:25
necessary [2] - 13:12, 33:19
need [2] - 53:22, 53:25
needed [1] - 13:11
needs [1] - 13:17
never [4] - 10:11, 35:7, 35:20, 60:13
next [6] - 6:5, 11:18, 12:9, 12:13, 24:11,

44:9
night [14] - 9:19, 9:21, 12:6, 21:22, 43:5, 43:6, 50:5, 56:15, 58:21, 58:22, 59:4, 59:8, 59:23, 62:24
nights [1] - 43:2
nighttime [5] - 21:12, 21:14, 21:18, 49:2, 49:7
nomenclature [1] - 16:23
normal [5] - 15:24, 19:16, 19:19, 19:20, 61:9
normally [1] - 13:6, 14:11, 43:22
note [2] - 57:5, 61:24
nothing [1] - 46:14
notice [1] - 21:2
notify [1] - 12:14
November [1] - 9:3
number [2] - 42:19, 52:10
Number [1] - 3:10
numbers [1] - 29:17

**O**

o'clock [1] - 45:16
oath [4] - 4:17, 5:9, 67:10
oaths [1] - 67:6
object [7] - 18:12, 21:4, 31:1, 48:7, 57:19, 58:21, 59:9
objection [3] - 6:15, 6:16, 32:11
objections [1] - 6:14
observe [2] - 47:1, 47:20
observed [1] - 31:25
observes [1] - 58:5
obtain [1] - 14:13
obviously [1] - 12:6
occurred [3] - 10:15, 30:2, 52:21
October [2] - 1:17, 65:3
OCTOBER [1] - 4:2
odd [1] - 63:4
OF [13] - 1:2, 1:7, 1:16, 2:4, 2:13, 3:1, 3:9, 65:2, 65:2, 65:3, 65:4, 66:1, 67:1
off-the-record [1] - 60:23
office [3] - 8:16, 14:16, 37:2
Office [4] - 3:11, 3:14,

3:17, 40:13
**OFFICE** [1] - 1:8
**Officer** [5] - 15:14,
15:17, 17:8, 20:13,
31:20
officer [18] - 14:12,
14:22, 20:5, 26:1,
26:5, 26:10, 31:9,
31:18, 32:2, 32:8,
32:25, 33:4, 37:9,
39:1, 50:19, 52:17,
60:11, 67:7
**officer's** [1] - 41:10
**officers** [13] - 7:5,
11:22, 13:8, 28:3,
30:15, 32:25, 33:5,
33:20, 33:24, 34:8,
52:11, 56:18, 60:6
**OFFICERS** [1] - 1:12
**OFFICES** [2] - 2:4,
2:13
once [9] - 6:14, 8:3,
10:11, 18:4, 19:11,
35:17, 42:1, 44:13,
47:7
one [24] - 4:18, 4:24,
5:25, 23:7, 24:7,
28:15, 30:6, 31:14,
44:20, 45:6, 45:7,
47:4, 52:15, 54:9,
54:20, 55:6, 58:17,
59:1, 60:8, 60:10,
62:7, 62:22, 63:4,
64:6
**One** [1] - 4:25
**ones** [1] - 16:18
**oOo** [2] - 3:7, 3:21
operating [1] - 56:18
operations [1] - 9:7
opinion [2] - 46:19,
60:1
opportunity [1] -
64:19
ordinary [1] - 26:12
**Oroville** [1] - 8:18
otherwise [1] - 6:1
outline [1] - 20:19
outlined [1] - 22:17
outside [1] - 16:1
outward [2] - 51:9,
51:21
outward-facing [2] -
51:9, 51:21
oversee [1] - 9:10
overt [2] - 39:6, 39:9
owed [1] - 38:22
own [5] - 13:16, 21:19,
23:1, 28:16, 66:7

**P**

**P.M** [1] - 4:2
p.m [5] - 1:18, 10:14,
43:3, 63:10
**P1** [1] - 36:18
**P2** [1] - 36:19
**P3** [1] - 36:19
page [7] - 3:16, 3:19,
5:7, 24:6, 29:16,
29:17, 30:7
**Page** [10] - 1:18, 3:2,
3:10, 65:9, 65:11,
65:13, 65:15, 65:17,
65:19, 65:21
pages [2] - 3:12, 64:4
part [1] - 31:18
particular [3] - 13:23,
20:23, 36:12
parties [3] - 14:14,
32:4, 32:22
passed [1] - 15:12
passing [2] - 17:19,
35:21
past [4] - 6:21, 10:4,
17:18, 33:3
pause [8] - 46:5,
46:22, 47:16, 48:2,
49:12, 49:24, 50:25,
52:9
**PENALTY** [1] - 66:1
penalty [1] - 66:8
people [3] - 9:9, 13:7,
31:3
per [6] - 19:15, 39:13,
44:13, 44:20, 56:6,
64:8
percent [1] - 58:19
**Perez** [14] - 10:1,
10:21, 11:14, 30:19,
30:21, 31:4, 31:8,
31:14, 31:17, 31:21,
32:9, 56:23, 57:4,
57:13
**PEREZ** [1] - 1:9
**PERJURY** [1] - 66:1
perjury [1] - 66:8
person [4] - 5:25,
11:21, 26:17, 34:24,
36:11, 41:5, 41:11
personally [1] - 13:9
personnel [7] - 12:14,
13:11, 13:14, 13:16,
13:24, 19:6, 19:13
perspective [3] -
22:21, 43:19, 57:7
pertains [1] - 35:17
**PETER** [1] - 2:9
petitioner's [1] - 28:7
photos [2] - 14:13,

14:14
physical [3] - 12:25,
17:2, 56:20
picked [1] - 21:4
picks [1] - 21:21
pictures [2] - 8:2, 8:12
place [3] - 8:7, 19:2,
56:8
placed [6] - 36:10,
36:12, 41:14, 41:19,
44:14, 67:10
places [1] - 42:1
**Plaintiffs** [2] - 1:5, 2:3
plaintiffs [3] - 4:8,
10:17, 62:22
plan [1] - 42:11
play [4] - 45:23, 46:21,
47:15, 49:11
plus [3] - 9:11, 56:18,
56:19
pod [49] - 8:8, 8:12,
10:16, 10:23, 11:19,
11:25, 12:2, 12:8,
13:2, 16:22, 17:3,
21:1, 21:14, 21:17,
21:24, 22:3, 22:11,
22:16, 22:22, 22:25,
23:1, 36:19, 38:5,
38:20, 40:3, 40:25,
43:9, 43:20, 43:23,
44:7, 44:22, 46:13,
49:6, 49:7, 50:9,
50:17, 50:20, 51:7,
52:4, 52:11, 52:25,
53:15, 56:3, 56:6,
56:7, 56:11, 57:16
pods [1] - 36:14
point [10] - 26:1, 26:3,
32:15, 40:10, 46:16,
47:5, 47:11, 48:9,
52:10, 59:1
pointed [2] - 52:1,
53:17
policies [8] - 17:24,
18:2, 18:12, 18:16,
18:18, 18:22, 19:2,
53:8
policy [3] - 26:3, 26:4,
26:7
population [2] - 35:23,
35:25
portion [1] - 55:11
posed [1] - 41:11
position [2] - 8:23,
14:7
possession [1] -
48:20
possible [3] - 15:7,
15:8, 57:20
post [9] - 19:5, 30:23,

31:12, 42:23, 43:20,
48:23, 48:25, 60:7
post-suicide [1] - 19:5
posting [1] - 60:13
practice [6] - 19:10,
26:13, 29:4, 44:4,
59:5, 59:7
practices [2] - 19:2,
29:6
predict [1] - 58:24
predicted [1] - 26:14
preparation [4] - 7:2,
7:9, 7:21, 24:8
presence [1] - 57:5
present [5] - 12:12,
25:16, 48:22, 53:3,
57:1
pretty [4] - 9:23, 21:7,
31:24, 39:7
prevention [3] - 36:5,
36:6, 42:2
previous [3] - 19:20,
48:18, 52:21
previously [2] - 23:24,
56:22
primarily [1] - 56:3
probable [3] - 15:9,
15:22, 15:23
problems [3] - 25:14,
27:8, 27:11
**Procedure** [1] - 67:14
procedure [1] - 32:18
proceed [1] - 6:17
proceedings [1] - 63:9
process [4] - 14:17,
15:18, 19:11, 29:5
production [1] - 62:12
program [3] - 4:23,
10:3, 35:24
promoted [1] - 9:2
promotions [2] - 8:25,
9:4
prosecution [1] -
14:16
protective [1] - 18:9
protocol [4] - 36:5,
36:6, 36:8, 36:10
provide [1] - 34:1
provided [8] - 34:11,
34:12, 43:9, 45:4,
60:21, 61:14
purposes [1] - 59:20
**Pursuant** [1] - 67:13
push [2] - 45:8, 45:13

**Q**

questions [11] - 6:7,
6:9, 16:6, 16:12,
16:14, 16:16, 54:4,

54:6, 54:13, 58:9,
62:3
quick [1] - 54:10

**R**

rack [6] - 47:14, 55:22,
57:18, 57:22, 58:20,
60:4
racks [1] - 58:14
radio [5] - 10:22,
11:12, 11:15, 11:17,
16:22
rank [2] - 8:23, 8:25
re [3] - 3:15, 3:18,
53:10
read [5] - 6:2, 57:2,
64:3, 66:4
readily [4] - 23:14,
23:16, 24:22, 24:23
**Reading** [3] - 64:13,
64:14, 64:15
reading [4] - 20:18,
29:13, 40:19, 62:8
reads [1] - 35:13
ready [2] - 40:20,
40:21
real [2] - 48:24, 55:18
real-time [2] - 48:24,
55:18
really [6] - 6:1, 32:5,
38:25, 42:8, 54:10
**Reason** [7] - 65:9,
65:11, 65:13, 65:15,
65:17, 65:19, 65:21
reason [4] - 6:24,
39:6, 58:6, 65:5
reasons [1] - 38:24
reassessment [1] -
35:13
received [3] - 8:25,
23:5, 23:10
reclassification [1] -
19:24
recognize [2] - 52:13,
61:15
recollection [2] -
37:21, 52:20
record [7] - 5:23, 6:16,
10:25, 54:3, 60:23,
65:6, 67:11
recorded [2] - 24:11,
53:2
records [3] - 7:10,
39:20, 39:24
recycle [1] - 47:19
recycling [2] - 47:21,
53:14
refer [1] - 36:7
reference [1] - 38:9

referred [1] - 30:22
referring [3] - 51:13, 57:11, 62:19
refresh [1] - 52:20
regarding [2] - 4:9, 26:7
regardless [1] - 59:22
regards [5] - 17:21, 17:25, 18:19, 18:23, 21:24
remember [5] - 12:4, 13:23, 37:14, 54:23, 55:5
remind [1] - 5:23
remotely [1] - 2:12
remove [1] - 45:10
report [17] - 7:13, 7:14, 7:16, 7:17, 14:15, 17:9, 17:11, 17:14, 20:12, 20:18, 20:20, 20:23, 29:23, 30:6, 37:3, 37:20
REPORTED [1] - 1:23
reported [1] - 67:8
Reporter [4] - 50:13, 53:24, 67:4, 67:25
REPORTER [2] - 62:4, 63:5
reporter [2] - 5:14, 43:8
reprimanded [1] - 10:10
requested [3] - 64:13, 64:15, 67:14
requests [1] - 50:13
resolved [2] - 25:15, 25:18
respond [3] - 10:22, 12:10, 33:1
responded [3] - 11:19, 30:16, 31:3
response [2] - 6:5, 12:3
responses [1] - 60:24
responsibilities [2] - 9:19, 9:20
responsibility [1] - 42:4
responsible [3] - 9:25, 44:22, 56:5
restrictions [1] - 53:8
restroom [2] - 53:19, 53:20
return [1] - 19:19
returned [1] - 55:2
returning [2] - 57:17, 58:6
review [10] - 7:10, 7:12, 7:23, 8:2, 8:6, 17:11, 32:2, 32:4,

48:19, 67:15
reviewed [14] - 7:13, 7:20, 8:13, 20:12, 20:20, 20:23, 21:1, 23:19, 24:7, 32:19, 32:21, 45:24, 46:3, 57:9
reviewing [2] - 55:11, 61:21
Road [2] - 1:20, 2:9
RON [2] - 2:4, 2:4
Ron [1] - 4:8
room [2] - 5:15, 41:19
rotation [1] - 43:7
rotations [1] - 10:2
route [1] - 21:6
rude [2] - 5:21, 33:16
Rule [1] - 67:13
rule [2] - 5:25, 59:22
rules [1] - 5:5
Rules [1] - 67:13

**S**

Sacramento [1] - 2:14
safe [1] - 16:3
safety [2] - 36:10, 41:6
saw [5] - 12:11, 32:15, 47:2, 47:12, 58:21
scale [1] - 35:14
scanning [2] - 56:6, 56:16
scene [7] - 12:10, 12:11, 12:15, 13:8, 14:14, 33:1, 33:5
schedule [1] - 44:24
scope [6] - 15:11, 16:19, 26:25, 34:19, 35:22, 40:2
screen [7] - 44:8, 46:9, 49:13, 51:2, 51:12, 52:7, 53:18
search [1] - 28:17
searched [1] - 18:9
second [1] - 51:17
seconds [1] - 12:1
sections [2] - 22:16, 23:1
secure [4] - 12:15, 12:18, 12:19, 26:16
secured [1] - 12:11
security [1] - 41:4
see [34] - 12:9, 21:25, 22:3, 22:12, 22:17, 23:2, 24:13, 30:2, 38:7, 42:7, 42:11, 48:6, 48:18, 48:24, 49:1, 49:3, 49:25, 50:3, 50:9, 50:23, 51:1, 51:11, 51:17,

51:19, 51:22, 52:3, 52:6, 52:8, 55:13, 55:25, 56:4, 57:19, 58:13, 58:23
seeing [2] - 12:4, 28:2
seeking [1] - 34:2
self [2] - 36:9, 56:17
self-harm [1] - 56:17
self-harming [1] - 36:9
send [1] - 58:1
sensitive [1] - 49:17
sent [1] - 33:11
separation [1] - 42:6
SERGEANT [1] - 1:11
Sergeant [3] - 20:9, 34:25, 35:2
sergeant [8] - 4:7, 9:2, 20:7, 23:23, 29:11, 54:7, 54:12, 60:20
serviceable [1] - 25:4
set [2] - 36:7, 67:18
severity [2] - 13:18, 14:20
shake [1] - 5:19
shall [2] - 64:18, 67:15
SHEET [1] - 65:1
SHERIFF [1] - 1:8
sheriff's [2] - 8:16, 37:2
Sheriff's [3] - 3:14, 3:17, 40:12
SHERIFF'S [1] - 1:8
Sheriffs [1] - 3:11
shift [13] - 9:15, 9:16, 9:18, 9:19, 9:21, 12:6, 37:23, 43:1, 44:13, 44:20, 56:15, 60:7
shifts [2] - 43:5, 43:6
Shorthand [2] - 67:4, 67:25
shortly [3] - 17:4, 25:10, 33:11
shot [1] - 51:12
show [2] - 39:20, 43:14
shower [3] - 44:9, 45:8, 45:13
shows [1] - 31:24
side [6] - 22:18, 22:20, 44:8, 46:8, 51:12, 53:18
sign [1] - 64:19
signature [3] - 61:8, 64:17, 64:20
SIGNATURE [1] - 64:1
signed [1] - 67:17
signing [3] - 64:13, 64:14, 64:15

simple [3] - 39:4, 55:23, 58:2
simply [1] - 34:3
single [3] - 36:13, 36:21, 39:14
situation [9] - 11:20, 12:10, 12:21, 13:6, 14:24, 16:12, 41:25, 58:15, 61:12
situational [1] - 58:18
situations [2] - 26:14, 26:19
six [3] - 23:22, 56:6, 56:13
so.. [12] - 20:21, 22:15, 25:4, 31:25, 32:15, 39:8, 39:15, 39:23, 40:3, 47:14, 50:22, 53:14
solely [3] - 49:6, 50:12, 56:11
someone [7] - 12:24, 13:10, 26:15, 33:7, 36:9, 39:6, 42:1
sometime [2] - 27:4, 54:23
sometimes [1] - 48:1
somewhere [2] - 37:17, 47:21
sooner [1] - 62:15
sorry [18] - 4:25, 8:11, 17:4, 18:11, 19:19, 22:7, 24:1, 26:11, 29:25, 30:13, 31:11, 33:16, 33:18, 36:1, 36:20, 50:14, 55:1
sort [2] - 44:24, 45:1
speaking [4] - 4:21, 15:4, 15:20, 16:8
special [2] - 10:3, 19:7
specific [1] - 17:20
specifically [1] - 6:18
speculation [1] - 24:21
speech [1] - 33:18
spent [1] - 14:22
spoken [2] - 7:3, 56:23
spot [1] - 44:2
SPP [1] - 36:4
spray [1] - 53:3
stabbings [1] - 39:11
staff [3] - 9:8, 13:23, 56:18
stamp [9] - 24:6, 28:8, 29:12, 34:16, 34:20, 35:12, 36:25, 37:18, 40:11
stand [1] - 26:2
standard [3] - 16:23,

38:25, 59:6
standing [1] - 48:25
stands [2] - 17:13, 36:4
start [7] - 6:3, 6:9, 8:19, 27:21, 42:10, 43:15, 56:6
state [3] - 25:22, 37:17, 64:5
State [2] - 66:9, 67:5
STATE [1] - 67:1
statement [1] - 38:4
statements [2] - 15:15, 36:10
STATES [1] - 1:1
stay [3] - 41:3, 43:25
STENOGRAPHER [2] - 4:25, 54:1
stenographically [1] - 67:7
step [3] - 12:13, 45:6, 45:7
steps [1] - 41:24
STILWELL [1] - 1:4
Stilwell [11] - 3:16, 4:9, 11:7, 13:14, 15:21, 15:25, 16:13, 34:13, 54:14, 54:24, 55:2
stop [1] - 6:14
stored [2] - 28:13, 28:20
straight [1] - 56:3
Street [1] - 2:5
strictly [1] - 53:11
strike [1] - 50:24
structures [1] - 22:14
stuff [1] - 40:1
submit [1] - 14:15
substances [1] - 6:21
sufficient [1] - 22:6
suicidal [1] - 17:25
suicide [12] - 19:1, 19:3, 19:5, 19:12, 19:18, 19:24, 36:5, 36:6, 36:11, 39:12, 41:14, 42:2
Suite [4] - 1:20, 2:5, 2:9, 2:14
Sunday [1] - 43:2
superior [1] - 7:5
supervise [3] - 9:9, 9:17, 9:19
supervised [1] - 20:9
supervises [1] - 20:7
supervising [4] - 9:25, 10:5, 34:4, 49:5
supervision [1] - 9:7
supervisor [2] - 57:14, 57:24

supplies [5] - 43:23, 44:10, 45:4, 47:25, 52:25
supposed [10] - 44:3, 44:16, 50:19, 53:12, 57:18, 57:21, 59:7, 59:15, 59:17, 59:24
surveillance [3] - 8:8, 31:24, 51:8
sweep [1] - 48:13
sweeping [2] - 48:11, 58:20
switch [1] - 45:12
sworn [1] - 4:4

## T

T1 [1] - 36:18
T2 [1] - 36:18
Tara [2] - 14:3, 14:4
tasks [1] - 56:14
team [1] - 10:2
ten [5] - 25:19, 25:20, 27:7, 27:12, 27:13
term [2] - 38:12, 38:14
testified [6] - 4:5, 4:14, 4:16, 4:22, 34:23, 55:9
testify [1] - 6:22
testifying [1] - 5:10
testimony [6] - 6:25, 33:9, 52:21, 55:17, 67:8, 67:12
thanked [1] - 55:3
that's.. [1] - 32:23
THE [9] - 2:13, 4:25, 5:1, 29:18, 29:20, 32:14, 50:14, 53:23, 54:1
the.. [1] - 36:24
themselves [5] - 18:10, 18:13, 19:14, 25:1, 34:3
therefore [1] - 67:15
third [1] - 52:17
thoughts [1] - 36:9
thousands [1] - 26:25
threat [6] - 12:19, 19:14, 29:9, 41:11, 59:25
threats [2] - 56:17
three [2] - 27:6, 37:12
throughout [3] - 9:13, 9:15, 56:15
Thursday [1] - 1:17
THURSDAY [1] - 4:2
tier [6] - 12:7, 22:18, 22:19, 22:21, 36:19, 53:20
timely [1] - 15:2

title [4] - 34:22, 37:1, 40:12, 61:3
today [2] - 6:25, 23:25
took [4] - 5:9, 8:7, 21:6, 57:5
top [3] - 35:13, 42:19, 51:23
total [2] - 36:21, 42:10
toward [1] - 57:7
towards [3] - 38:3, 51:23, 58:14
tower [1] - 22:22, 30:22, 31:9, 31:11, 42:24, 50:10, 50:11, 50:16, 55:19, 56:4, 56:11, 56:14, 60:11
track [1] - 50:6
training [1] - 60:13
transcript [7] - 6:1, 57:2, 62:11, 63:6, 67:11, 67:15, 67:17
transcription [1] - 65:8
transcripts [1] - 62:5
transport [7] - 7:15, 7:17, 13:12, 34:1, 34:10, 34:11, 34:12
transported [1] - 62:23
transporting [1] - 34:4
trap [1] - 6:9
trash [5] - 44:5, 44:6, 45:21, 47:17, 53:13
treatment [2] - 13:11, 34:3
trick [1] - 6:8
trips [1] - 39:13
true [3] - 66:7, 66:10, 67:11
try [6] - 6:8, 22:9, 33:22, 38:16, 41:23, 41:24
trying [2] - 5:21, 33:16
turn [5] - 6:4, 29:11, 35:12, 36:25, 40:11
two [8] - 33:11, 33:24, 34:8, 54:9, 54:24, 60:15, 62:8, 62:21
type [10] - 13:6, 16:5, 34:17, 35:6, 35:15, 35:20, 37:5, 39:20, 41:25, 45:4
types [3] - 26:9, 26:18, 39:17
typical [1] - 19:10

## U

U1 [1] - 36:18
unavoidable [1] - 56:9

uncommon [2] - 32:24, 46:11
uncooperative [1] - 26:13
under [4] - 4:17, 57:23, 66:8, 67:10
UNDER [1] - 66:1
understood [4] - 5:17, 6:6, 6:10, 49:24
unit [20] - 11:19, 12:7, 12:17, 19:7, 19:17, 20:8, 20:10, 21:7, 22:14, 34:18, 34:24, 41:2, 42:4, 50:12, 50:22, 51:10, 51:24, 55:20, 56:6, 56:20
UNITED [1] - 1:1
units [4] - 36:14, 42:16, 49:4, 56:14
unknown [1] - 23:20
unless [2] - 6:17, 39:6
unscrewing [1] - 55:12
unusual [1] - 46:11
up [8] - 10:10, 19:6, 21:4, 21:21, 27:7, 27:11, 41:10, 58:10
upper [1] - 51:11
ups [1] - 54:10
utilize [2] - 26:11, 59:12
utilized [3] - 25:7, 25:11, 55:19
utilizing [1] - 59:20

## V

vaguely [1] - 54:23
valid [1] - 42:8
VARANINI [1] - 2:13
various [2] - 36:15, 38:21
verbalize [2] - 5:16, 5:21
verbatim [1] - 5:15
verbiage [1] - 53:10
via [1] - 10:22
video [42] - 8:3, 8:5, 8:7, 8:11, 8:12, 20:20, 20:21, 20:24, 21:1, 21:15, 21:16, 21:19, 21:25, 22:3, 22:11, 32:2, 32:4, 32:14, 43:9, 43:15, 43:19, 45:23, 45:24, 46:2, 46:5, 46:16, 46:22, 46:23, 47:2, 48:4, 48:7, 48:21, 49:8, 50:6, 50:8, 50:23, 52:6, 52:9,

52:19, 55:11, 57:9
Video.........................
........ [1] - 3:13
videos [2] - 8:2, 8:12
view [5] - 21:14, 32:15, 51:7, 51:17, 52:3
viewing [2] - 22:10, 46:23
violation [1] - 59:22
visible [1] - 22:4
visual [1] - 21:18
voice [1] - 6:15
voluntary [1] - 27:15
vs [1] - 1:6

## W

W5 [1] - 36:18
W6 [1] - 36:18
WAHLBERG [1] - 1:10
waived [2] - 64:14, 64:20
walking [5] - 45:20, 46:8, 46:12, 57:7, 58:14
walks [1] - 50:21
wall [3] - 21:6, 48:3, 57:7
wand [1] - 45:9
WASHINGTON [18] - 2:8, 2:9, 10:24, 18:11, 29:16, 29:19, 30:25, 32:11, 36:2, 54:9, 54:11, 58:8, 62:10, 62:15, 62:20, 63:1, 63:7
WASHINGTON..........
........................ [1] - 3:4
watch [10] - 9:22, 19:1, 19:4, 19:5, 19:12, 19:18, 19:24, 36:11, 41:14, 42:2
watched [2] - 8:3, 8:4
watching [3] - 48:21, 50:17, 56:5
water [3] - 45:22, 53:14, 53:15
wear [1] - 27:16
week [2] - 43:7, 43:25
weekend [1] - 43:2
welfare [1] - 18:3
WELLPATH [1] - 1:13
Wellpath [1] - 13:21
whole [2] - 28:15, 56:7
Windex [1] - 45:6
witness [3] - 64:17, 64:18, 66:3
WITNESS [7] - 5:1,

29:18, 29:20, 32:14, 50:14, 53:23, 65:4
workout [3] - 59:6, 59:13, 59:20
works [1] - 27:17
worn [1] - 25:23
written [10] - 10:10, 18:12, 36:7
wrote [1] - 55:16

## Y

Ye's [2] - 16:15, 31:18
year [2] - 27:23, 27:24
years [3] - 27:6, 33:4, 37:12
Yee [10] - 7:14, 7:17, 14:10, 14:22, 15:14, 15:17, 17:8, 20:13, 24:15, 31:20
yourself [1] - 52:13