1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   CLARENCE BEAVER and JOSEPH          No. 2:20-cv-00279 WBS DB
     STILWELL,
13
                 Plaintiffs,
14                                       ORDER RE: DEFENDANTS' MOTION
          v.                             FOR SUMMARY JUDGMENT
15
     COUNTY OF BUTTE; BUTTE COUNTY
16   SHERIFF'S OFFICE; SHERIFF KORY
     L. HONEA, in his individual
17   capacity; DEPUTY PEREZ, in his
     individual capacity; DEPUTY
18   WALBERG, in his individual
     capacity; SERGEANT J. BEHLKE, in
19   his individual capacity;
     CORRECTIONAL OFFICERS JOHN DOE
20   1-10; WELLPATH, LLC; CALIFORNIA
     FORENSIC MEDICAL GROUP,
21
                 Defendants.
22

23                              ----oo0oo----

24           Plaintiffs Clarence Beaver and Joseph Stilwell brought

25   this action against defendants County of Butte ("the County");

26   the Butte County Sheriff's Office; Sheriff Kory L. Honea; Deputy

27   Esteban Perez; Deputy Chadwick Walberg; Sergeant Jason Behlke;

28

                                     1

1  Wellpath, LLC; and California Forensic Medical Group

2  (collectively, "defendants") alleging negligence and violation of

3  their Eighth and Fourteenth Amendment rights under 42 U.S.C. §

4  1983.[1]  (Second Amended Complaint ("SAC") (Docket No. 21).)

5  Before the court is defendants' motion for summary judgment.

6  (Docket No. 29-1.)

7  I.   <u>Factual and Procedural History</u>

8         In early 2019, plaintiff Beaver was an inmate at the

9  Butte County Jail and plaintiff Stilwell was a pretrial detainee

10 there.  (Pls.' Resp. to Defs.' Statement of Undisp. Facts at ¶ 1

11 ("Resp.") (Docket No. 37-2); SAC at ¶¶ 6-7.)  Both were housed in

12 G-Pod, a dormitory-style housing unit for inmates classified as

13 requiring medium-security housing.  (Resp. at ¶¶ 2-3.)

14         On February 6, 2019, Antonio Hernandez was booked into

15 the jail on charges of felony domestic violence.  (<u>Id.</u> at ¶ 4.)

16 Hernandez went through the jail's initial inmate classification

17 process upon admission.  (<u>Id.</u> at ¶¶ 5-7.)  The process entails an

18 interview by a classification officer and completion of a

19 worksheet, the results of which are processed by an algorithm to

20 yield a score indicating whether the inmate should be placed in

21 minimum-, medium-, or maximum-security housing.  (<u>Id.</u>)  The

22 interviewing officer may then deviate from that assignment based

23 on his subjective assessment during the interview.  (<u>Id.</u> at ¶ 8.)

24         The algorithm assigned Hernandez the minimum score

25 necessary to designate him as requiring maximum-security housing;

26 _____

27      [1]    Defendants Wellpath, LLC and California Forensic
   Medical Group have since been dismissed from the case pursuant to
   a stipulation by the parties.  (Docket Nos. 35-36.)

28

however, based on Hernandez's demeanor during the interview, lack of a history of fighting or discipline in jail, and work history, the officer overrode that designation and instead classified him as requiring medium-security housing. (Id. at ¶¶ 8-14.)[2]  That decision was reviewed and approved of by another classification officer and by a supervisory sergeant. (Id. at ¶¶ 15-17.)

After being initially assigned to the L-Pod housing unit, Hernandez requested to be reassigned to J-Pod. (Id. at ¶ 18.)  However, after reporting that he feared for his safety there and sought to be placed on suicide watch because of anxiety, Hernandez was evaluated and moved to a single-occupancy cell for two weeks pursuant to the jail's suicide prevention protocol. (Id. at ¶¶ 19-21.)  While there, he was frequently assessed and underwent weekly classification reviews, and after two weeks the reviewing officer concluded that, based on the lack of recent incidents, Hernandez could be moved back into the general population, again in medium-security housing. (Id. at ¶¶ 20-24.)  On February 25, the following day, pursuant to that decision officers attempted to move Hernandez into M-Pod, but Hernandez refused to be housed there for reasons he would not explain. (Id. at ¶¶ 25-29.)  Hernandez was then reassigned to G-Pod, another medium-security housing unit. (Id. at ¶¶ 3, 30-31.)

Beaver testified that in the following days before March 7, Hernandez did not threaten him or other inmates and was not involved in any physical altercations. (Id. at ¶ 33.)

---

[2]    Hernandez's inmate records also indicated that he had reported having bipolar disorder, experiencing mood swings, and a desire to speak to a mental health professional. (Id. at ¶¶ 11-14; Pls.' Ex. B at 6, 55 (Docket No. 38-1).)

3

1   However, Beaver and Stilwell believed that Hernandez had issues

2   with his mental health, and on one occasion Stilwell heard

3   Hernandez muttering to himself about hurting people; Stilwell

4   testified that he believed he alerted a correctional officer to

5   this, though he could not recall whom or when.  (Id. at ¶¶ 32-33,

6   35-36; Stilwell Depo. at 41:9-14 (Docket No. 38-3).)  Prior to

7   March 7, 2019, defendants Perez, Wahlberg, and Behlke all either

8   had not encountered Hernandez or had not experienced any

9   incidents with him, and two other correctional officers have

10  given similar testimony.  (Resp. at ¶¶ 39-43.)  The only item in

11  Hernandez's classification file documenting disobedience or other

12  misbehavior was regarding his refusal to remain in M-Pod on

13  February 25.  (Id. at ¶ 38.)

14          During the early morning hours of March 7, 2019, Perez

15  was on duty at the observation and control tower for the floor

16  that included G-Pod.  (Id. at ¶ 44.)  At approximately 2:55:22

17  a.m., Perez saw Hernandez in G-Pod's day room walking toward the

18  bunk area.  (Id. at ¶¶ 45-47.)  Perez testified that the policy

19  after lights-out allows inmates to be in the day room until 11:30

20  p.m., and that ordinarily, if Perez saw an inmate "just walking

21  around" or loitering in the day room after that time, Perez would

22  instruct him via intercom to return to his bunk.  (Id. at ¶¶ 48-

23  50.)  Perez also testified that it was common for inmates to go

24  into the day room throughout the night to retrieve possessions

25  they had left there.  (Id. at ¶ 48.)  Perez did not say anything

26  to Hernandez via the intercom on this occasion.  (Perez Depo. at

27  20:10-12 (Docket No. 38-5 at 5).)

28          When Perez saw Hernandez, Perez was observing G-Pod

4

1   through the glass window in the observation tower, rather than

2   via a video feed accessible on a monitor in the tower.  (Resp. at

3   ¶¶ 52-53.)  Perez could have activated the video feed, which

4   would have required him to look away from Hernandez and navigate

5   through three or four menus on a control panel, but he did not.

6   (Id. at ¶¶ 53-54.)  Perez's direct view of G-Pod was darker than

7   it appeared on the video feed, and Perez did not see anything in

8   Hernandez's hand as he walked toward the bunks.  (Id. at ¶¶ 55-

9   56.)  Perez lost sight of Hernandez as Hernandez entered the bunk

10  area, which was darker than the day room, and next noticed a

11  "scuffling of individuals" among the bunks.  (Id. at ¶¶ 57-58.)[3]

12          Within a few seconds Perez reported a physical

13  altercation in G-Pod via radio, and the lights soon turned on in

14  the unit.  (Id. at ¶¶ 58-60.)  Within around 30 seconds of

15  Perez's call, correctional officers began entering G-Pod; eight

16  officers responded in total, including Behlke and Walberg.  (Id.

17  at ¶¶ 61, 66-67.)  Officers observed Stilwell on the ground,

18  bleeding, and Beaver on his bunk holding a sheet to his face,

19  which was also bleeding.  (Id. at ¶¶ 68-69.)  Beaver and Stilwell

20  stated that Hernandez had assaulted them, and Hernandez was

21  quickly restrained; video later revealed that Hernandez had

22  beaten plaintiffs with a broom head and using his fist.  (Id. at

23  ¶¶ 68-70, 73.)  Nurses assessed plaintiffs' injuries within a few

24  _____

25          [3]   Although Perez temporarily lost sight of Hernandez, he
    testified that he did not turn his attention away from G-Pod

26  until after the incident concluded.  (Id. at ¶ 65.)  Prior to
    observing Hernandez walking toward the bunks, Perez had been

27  reviewing a piece of outgoing inmate mail, a regular part of his
    night shift duties that he performed while intermittently looking

28  up to monitor the housing units.  (Id. at ¶¶ 62-64.)

minutes and had plaintiffs sent to a hospital for treatment. (Id. at ¶ 71.)  Hernandez was handcuffed and taken to an interview room.  (Id. at ¶ 75.)

In March of 2019, the Butte County Sheriff's Office was party to a stipulated consent decree setting forth procedures to avoid overcrowding in the jail, including by requiring the jail to maintain an Own Recognizance Program through which it followed detailed guidelines in determining the order in which to release inmates.  (Id. at ¶¶ 91-96.)  The consent decree requires that both the overall jail population and each housing unit not exceed maximum capacity at any time.  (Id. at ¶ 99.)  It further requires that each inmate be provided a bed "in the appropriate classification."  (Id. at ¶ 98.)  It allows the Sheriff to re-house inmates, to avoid having to release others because of unit population limits, "so long as any inmate so re-housed i[s] placed in a housing unit consistent with said inmate's classification."  (Id. at ¶¶ 98-100.)

In 2015, Sheriff Honea submitted a letter to the Butte County Board of Supervisors requesting funding for a new jail, stating in part:

> The jail currently has an inmate population in which nearly half the detainees (48.4%) require high-security housing.  The jail, however, currently only contains 31 cells which can accommodate this inmate population.  The other housing in the facility includes double-occupancy cells and dormitory beds/bunks.  Only 18.5% (111) of inmates are classified as requiring minimum security dormitory housing beds.  In contrast, the jail is configured with 421 dormitory-style beds which account for 68.6% of available housing.  This stark difference in inmate security classifications compared to the type of custody beds contained in the jail not only complicates classification decisions, but places the safety of inmates, staff, and visitors at higher risk.

1  (Pls.' Ex. A at 6-7 (Docket No. 38).)

2  II.  Legal Standard

3  Summary judgment is proper "if the movant shows that

4  there is no genuine dispute as to any material fact and the

5  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

6  P. 56(a).  A material fact is one "that might affect the outcome

7  of the suit under the governing law," and a genuine issue is one

8  that could permit a reasonable trier of fact to enter a verdict

9  in the non-moving party's favor.  Anderson v. Liberty Lobby,

10 Inc., 477 U.S. 242, 248 (1986).  The moving party bears the

11 initial burden of establishing the absence of a genuine issue of

12 material fact and may satisfy this burden by presenting evidence

13 that negates an essential element of the non-moving party's

14 case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

15 (1986).  Alternatively, the movant may demonstrate that the non-

16 moving party cannot provide evidence to support an essential

17 element upon which it will bear the burden of proof at

18 trial.  Id.  The burden then shifts to the non-moving party to

19 set forth specific facts to show that there is a genuine issue

20 for trial.  See id. at 324.  Any inferences drawn from the

21 underlying facts must, however, be viewed in the light most

22 favorable to the non-moving party.  See Matsushita Elec. Indus.

23 Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

24 III. Discussion

25 In the operative complaint, plaintiffs assert five

26 claims against defendants: (1) negligent supervision, training,

27 hiring, and retention against the County and Sheriff Honea;

28 (2) municipal liability against the County, Honea, and the

1   Sheriff's Office; (3) deliberate indifference against Perez,

2   Walberg, and Behlke; (4) denial of adequate medical care[4]; and

3   (5) negligence against all County defendants.  (SAC at ¶¶ 21-41.)

4   The court will begin with plaintiffs' federal claims.

5           A.    <u>Federal Claims Against Individual Officers</u>

6           In response to plaintiffs' deliberate indifference

7   claim, defendants Perez, Walberg, and Behlke assert the defense

8   of qualified immunity.  (Mot. at 23-24.)  In actions under 42

9   U.S.C. § 1983, the defense of qualified immunity "protects

10  government officials 'from liability for civil damages insofar as

11  their conduct does not violate clearly established statutory or

12  constitutional rights of which a reasonable person would have

13  known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)

14  (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "In

15  determining whether a state official is entitled to qualified

16  immunity in the context of summary judgment, [courts] consider

17  (1) whether the evidence viewed in the light most favorable to

18  the plaintiff is sufficient to show a violation of a

19  constitutional right and (2) whether that right was 'clearly

20  established at the time of the violation.'"  <u>Sandoval v. Cnty. of</u>

21  <u>San Diego</u>, 985 F.3d 657, 671 (9th Cir. 2021) (citation omitted).

22          The court has discretion to decide which prong to

23  address first and, if analysis of one proves dispositive, the

24  _____

25      [4]    Because this claim primarily challenged acts and
    omissions by Wellpath, LLC and California Forensic Medical Group,
26  which have been dismissed as defendants from this case,
    plaintiffs do not oppose summary judgment as to this claim.  (<u>See</u>
27  Opp. at 17 (Docket No. 37).)  The court will therefore grant
    summary judgment for defendants on plaintiffs' claim for denial
28  of medical care.

1    court need not analyze the other.  See Pearson, 555 U.S. at 236.

2    Here, the court will exercise its discretion to analyze the

3    second prong first: whether defendants' conduct violated a

4    clearly established constitutional right.

5                     1.   Clearly Established Right

6              "A right is clearly established when it is

7    'sufficiently clear that every reasonable official would have

8    understood that what he is doing violates that right.'"  Rivas-

9    Villegas v. Cortesluna, 142 S. Ct. 4, 7 (2021) (quoting Mullenix

10   v. Luna, 577 U.S. 7, 11 (2015)).  When determining whether a

11   right is clearly established, the court may not "define clearly

12   established law at a high level of generality."  Kisela v.

13   Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting Ashcroft v. Al-

14   Kidd, 563 U.S. 731, 742 (2011)).  Rather, "[t]his inquiry 'must

15   be undertaken in light of the specific context of the case, not

16   as a broad general proposition.'"  Rivas-Villegas, 142 S. Ct. at

17   8 (citation omitted); see White v. Pauly, 137 S. Ct. 548, 552

18   (2017) ("[T]he clearly established law at issue must be

19   particularized to the facts of the case.").

20             The Eighth Amendment provides a right for incarcerated

21   individuals to be protected from violence at the hands of other

22   inmates.  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).  The

23   Fourteenth Amendment's Due Process Clause provides an analogous

24   right for pretrial detainees, given that they have not been

25   convicted of a crime and therefore do not fall within the ambit

26   of Eighth Amendment protections.  See Castro v. Cnty. of Los

27   Angeles, 833 F.3d 1060, 1067 (9th Cir. 2016) (en banc).

28             In opposing qualified immunity, plaintiffs argue that,

                                    9

under Farmer and Castro, they "had a right to be safe and secure
pursuant to the Eighth Amendment" and that the
unconstitutionality of the Perez's, Walberg's, and Behlke's
conduct was thus clearly established.  (Opp. at 18 (Docket No.
37).)  However, in so doing they seek to "define clearly
established law at a high level of generality," rather than "in
light of the specific context of the case," which the Supreme
Court has repeatedly directed courts not to do.  Kisela, 138 S.
Ct. at 1152; Rivas-Villegas, 142 S. Ct. at 8.  Rather, for
qualified immunity to be overcome, existing case law must have
identified a constitutional violation in circumstances
sufficiently similar to those in this case that defendants here
would have been on notice that their conduct was unlawful.
Sandoval, 985 F.3d at 674.  Plaintiffs have not shown this is the
case.

        At oral argument, when asked which prior court
decisions would have best put defendants on notice that their
conduct was unconstitutional, counsel for plaintiffs pointed to
Farmer.  There, the plaintiff, a transgender woman, was placed in
the general population of a penitentiary for male prisoners.
Farmer, 511 U.S. at 829-30.  The Court noted that "penitentiaries
are typically higher security facilities that house more
troublesome prisoners than federal correctional institutes."  Id.
at 830.  Within two weeks, the plaintiff was beaten and raped by
another inmate in her cell.  Id.  She brought a claim against
various federal prison officials under Bivens v. Six Unknown
Federal Narcotics Agents, 403 U.S. 388 (1971), alleging the
defendants were deliberately indifferent to the risk of harm she

1  would face based on their knowledge "that the penitentiary had a

2  violent environment and a history of inmate assaults" and that

3  plaintiff, "who 'project[ed] feminine characteristics,' would be

4  particularly vulnerable to sexual attack by [other] inmates."

5  Farmer, 511 U.S. at 831.

6          In Farmer, the Court merely clarified the meaning of

7  "deliberate indifference" in the Eighth Amendment context and

8  remanded for further proceedings in light of that clarification;

9  it did not hold that defendants' conduct in fact amounted to a

10 constitutional violation.  See id. at 832-49.  Even if it had,

11 because of the significant differences between Farmer and this

12 case, Farmer could not have put defendants here on notice that

13 their conduct was unconstitutional.  Specifically, plaintiffs

14 here have not pointed to a noteworthy history of violent assaults

15 within the jail's medium-security housing or argued that they had

16 characteristics that made them especially vulnerable to assault.

17 Accordingly, Farmer did not clearly establish the

18 unconstitutionality of defendants' conduct in this case.

19         In Castro, the other case plaintiffs point to in

20 challenging qualified immunity, the plaintiff, who was highly

21 intoxicated, was placed in a sobering cell at a police station,

22 where a second, "combative" arrestee was then also placed.

23 Castro, 833 F.3d at 1065.  After the second arrestee entered the

24 cell, the plaintiff pounded on the window on the door for a full

25 minute to attract an officer's attention, but none came even

26 though one was seated at a desk nearby.  Id. at 1065, 1073.

27 Twenty minutes later, an unpaid volunteer assigned to monitor the

28 cell noticed the second arrestee inappropriately touching the

11

1   plaintiff and reported it to an officer, who went to check on the

2   plaintiff six minutes later and found him severely beaten.  Id.

3   at 1065.  The court concluded that the defendants' conduct was

4   objectively unreasonable given that the defendants knew the

5   plaintiff "was too intoxicated to care for himself," knew the

6   second arrestee "was enraged and combative," knew "the jail's

7   policies forbade placing the two together in the same cell in

8   those circumstances," failed to respond to the plaintiff pounding

9   on the cell door, and delegated safety checks to a volunteer.

10  Id. at 1073.

11          Here, prior to the attack itself, the undisputed facts

12  show that neither Perez, Walberg, nor Behlke had received any

13  indication that Hernandez posed a threat to other inmates.

14  Although in their opposition plaintiffs emphasize that defendants

15  were aware that Hernandez had "mental issues" and had asked to be

16  placed on suicide prevention protocol, at most this would have

17  suggested that he was a danger to himself, rather than to others.

18  Nor do the undisputed facts, viewed in the light most favorable

19  to plaintiffs, indicate that these defendants failed to quickly

20  respond once the existence of a threat to plaintiffs became

21  apparent: Perez radioed for help within seconds of seeing signs

22  of a conflict, and Walberg and Behlke arrived within thirty to

23  sixty seconds of Perez's call.  And although plaintiffs argue

24  that Perez failed to adequately monitor them by virtue of the

25  fact that he was reviewing inmate mail while on watch duty,

26  Perez's deposition testimony shows that he was in fact watching

27  Hernandez during the leadup to the encounter.  These facts stand

28  in contrast to Castro, where law enforcement officials neglected

12

1    to check on the plaintiff for at least twenty minutes, were

2    oblivious to his clear attempts to get their attention, and had

3    delegated responsibility for monitoring him to a volunteer.

4           In sum, these circumstances are not sufficiently

5    similar to those in Castro for that decision to have put

6    defendants on notice that their conduct violated plaintiffs'

7    constitutional rights in this case.  Nor has this court been able

8    to identify any other Ninth Circuit or Supreme Court precedent

9    finding a constitutional violation in circumstances closer to

10   these.  Accordingly, the unconstitutionality of the individual

11   defendants' conduct was not clearly established, meaning they are

12   entitled to qualified immunity.  The motion for summary judgment

13   will therefore be granted as to plaintiffs' claims for deliberate

14   indifference against defendants Perez, Walberg, and Behlke.

15          B.   Municipal Liability

16          Plaintiffs allege that the County, the Sheriff's

17   Office, and Honea "had a policy and practice of neglecting inmate

18   health and safety, by allowing the inmates all to be herded into

19   a single space indiscriminately, as though they were cattle,

20   without any consideration as to the level of danger posed by the

21   mental health conditions of any of the inmates."  (SAC at ¶ 26.)

22   In their opposition, they explain that the policy is elucidated

23   by Honea's 2015 letter to the Board of Supervisors, in which he

24   stated that a lack of sufficient housing at the jail to house all

25   prisoners in accordance with their security classifications

26   "complicates classification decisions" and "places the safety of

27   inmates . . . at higher risk."  (Opp. at 12, 19-20.)  In other

28   words, they argue that the jail's policy of adhering to the

1    consent decree under these circumstances, thereby preventing it

2    from "provid[ing] housing accommodations . . . appropriate for

3    each individual inmate with known physical and/or mental

4    conditions," led to the attack plaintiffs experienced.  (See id.)

5            To state a § 1983 claim against a municipality, a

6    plaintiff must allege "(1) that he possessed a constitutional

7    right of which he was deprived; (2) that the municipality had a

8    policy; (3) that this policy 'amounts to deliberate indifference'

9    to the plaintiff's constitutional right; and (4) that the policy

10   is the 'moving force behind the constitutional violation.'"

11   Oviatt ex rel. Waugh v. Pearce, 954 F.2d 1470, 1474 (9th Cir.

12   1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389-91

13   (1989)).  "'Municipal liability under § 1983 attaches where --

14   and only where -- a deliberate choice to follow a course of

15   action is made from among various alternatives' by [municipal]

16   policymakers."  Canton, 489 U.S. at 389 (quoting Pembaur v. City

17   of Cincinatti, 475 U.S. 469, 483-84 (1986) (plurality opinion)).

18   The "first inquiry in any case alleging municipal liability under

19   § 1983 is the question whether there is a direct causal link

20   between a municipal policy or custom and the alleged

21   constitutional deprivation."  Id. at 385.

22           As an initial matter, to the extent plaintiffs' claim

23   posits that defendants' adherence to an enforceable consent

24   decree itself constitutes an unlawful policy, plaintiffs do not

25   explain how such adherence constitutes "a deliberate choice . . .

26   from among various alternatives," given that defendants are

27   legally bound to abide by the consent decree's terms.  Id. at

28   389.  It is not apparent, nor do plaintiffs suggest, what

1  "alternatives" to adherence in fact exist.

2      Plaintiffs relatedly argue that, pursuant to this

3  policy, defendants routinely place inmates in housing of a

4  different security class than that for which they have been

5  classified.  (See Opp. at 12, 19-20.)  However, even assuming the

6  evidence supports the existence of such a practice, plaintiffs

7  fail to demonstrate how it in fact caused them to be attacked by

8  Hernandez.  Pursuant to the jail's inmate classification

9  procedures, upon admission Hernandez was classified as requiring

10  medium-security housing.  Plaintiffs had been likewise

11  classified, and G-Pod -- the housing unit into which plaintiffs

12  and Hernandez had all been assigned -- was a medium-security

13  housing unit.  (Resp. at ¶ 3.)  There is therefore no showing

14  that Hernandez was placed in a housing unit of a lower security

15  level than his classification called for, as would be necessary

16  to show that defendants' decisions regarding his placement

17  conformed to the alleged unconstitutional policy.  It cannot be

18  the case that a policy of placing inmates in lower-security

19  housing than their classifications called for caused plaintiffs'

20  injuries where such a policy was not actually carried out in

21  Hernandez's case.  See Canton, 489 U.S. at 385.

22      Further, insofar as plaintiffs argue the alleged policy

23  entailed a failure to place inmates identified as having mental

24  health issues posing a risk to others in segregated housing, (see

25  Opp. at 20 (contending that the jail had "no room . . . to

26  accommodate someone like Antonio Hernandez who they knew had

27  mental health issues" and that he "c[ould] not be accommodated

28  for his special needs")), they have not shown that Hernandez was

15

so identified or that the jail's screening measures were inadequate.  The undisputed evidence shows that Hernandez reported to jail staff that he wished to be put on suicide watch and that this was promptly done, resulting in him being placed in protective custody for two weeks, where he received frequent mental health assessments and weekly classification reviews. Plaintiffs identify no deficiency in these procedures that, if corrected, would have demonstrated to jail officials that Hernandez posed a threat to other inmates and that medium-security housing was no longer suitable for him.[5]

Finally, plaintiffs note that Honea's 2015 letter to the Board of Supervisors suggests that, because of insufficient cells specifically designed to serve as "high-security housing," many inmates who fall into this category are instead assigned to more abundant dormitory-style beds, which the letter indicates are designed to accommodate inmates classified as requiring minimum-security housing.  (See Opp. at 19-20.)  However, the

---

[5]    Although plaintiffs emphasize that Hernandez was temporarily placed in an interview room, rather than in administrative segregation, after he refused to be housed in M-Pod, they do not show that Hernandez would have been housed in administrative segregation on the day of the attack but for this lack of space.  Nor do they show that any systemic failure of the jail's mental health evaluation process led it to erroneously conclude that administrative segregation was not required in Hernandez's case.

Further, even if Stilwell reported that Hernandez was muttering statements to himself suggesting he wanted to hurt others -- Stilwell testified that he believed he reported this to jail officials, though he could not remember who (Stilwell Depo. at 41:9-14) -- this alone is insufficient to create a triable issue of fact as to whether the jail had mental health evaluation policies evincing deliberate indifference to the risk mentally unwell inmates posed to others.

1   letter does not indicate whether dormitory housing beds are

2   likewise suitable for medium-security housing, or whether that

3   level of security requires some other type of housing

4   arrangement.  Accordingly, it is not clear that medium-security

5   inmates have, as a matter of jail policy, been placed in

6   insufficiently secure housing.

7           More importantly, even assuming the jail's housing

8   practices and conformity with the consent decree could have

9   caused medium-security inmates to be placed in insufficiently

10  restrictive minimum-security housing, the undisputed evidence

11  does not present a genuine issue of material fact as to whether

12  this practice "amounts to deliberate indifference" to safety

13  risks it presents.  Canton, 489 U.S. at 389.  Honea's letter

14  itself demonstrates that he actively petitioned the legislature

15  for a new facility that would remedy the housing insufficiencies

16  he identified, (see Opp. at 20 (describing Honea as "sounding the

17  alarm" by submitting the letter)), and the fact that he was

18  apparently unsuccessful does not mean his consequent reliance on

19  the existing facility constituted deliberate indifference.  See

20  Canton, 489 U.S. at 389 (municipal liability requires a

21  "deliberate choice to follow a course of action . . . from among

22  various alternatives"); cf. also Peralta v. Dillard, 744 F.3d

23  1076, 1082-83 (9th Cir. 2014) (en banc) (in § 1983 actions

24  seeking damages, courts consider lack of resources available to

25  defendants in evaluating whether practices or decisions

26  demonstrate deliberate indifference, given that whether

27  officials' conduct may be so characterized "depends on the

28  constraints facing [them]") (quoting Wilson v. Seiter, 501 U.S.

17

1   294, 302 (1991)).

2           For the foregoing reasons, viewing the evidence in the
3   light most favorable to plaintiffs, plaintiffs have failed to
4   present a genuine issue of material fact as to whether the
5   County, the Sheriff's Office, and Sheriff Honea maintained an
6   unconstitutional policy or custom that caused plaintiffs'
7   injuries.  Accordingly, the court will grant summary judgment to
8   defendants on this claim.

9           C.   Negligence Claims

10          Because the court will grant summary judgment for
11  defendants on plaintiffs' federal claims, the court no longer has
12  federal question jurisdiction, and there is no suggestion that
13  there is diversity jurisdiction in this case.  Federal courts
14  have "supplemental jurisdiction over all other claims that are so
15  related to claims in the action within such original jurisdiction
16  that they form part of the same case or controversy under Article
17  III of the United States Constitution."  28 U.S.C. § 1367(a).  A
18  district court "may decline to exercise supplemental jurisdiction
19  . . . [if] the district court has dismissed all claims over which
20  it has original jurisdiction."  28 U.S.C. § 1367(c).

21          In determining whether to retain jurisdiction over
22  state law claims when all federal claims have been eliminated
23  before trial, courts balance factors of judicial economy,
24  convenience, fairness, and comity.  Carnegie-Mellon Univ. v.
25  Cohill, 484 U.S. 343, 350 n.7 (1988).  Here, these factors weigh
26  in favor of retention inasmuch as this case has now been pending
27  in this court for over two years, and the court has already
28  adjudicated prior motions.  Accordingly, to remand the remaining

1  claims to state court would be a poor use of judicial resources

2  and inconvenient to the parties who have spent considerable time

3  litigating in this court.  The court will therefore retain

4  jurisdiction over plaintiffs' state-law claims.

5          In those claims, plaintiffs have alleged negligence

6  against the County defendants, including against Honea and the

7  County under a theory of negligent supervision, training, hiring,

8  and retention.  (SAC at ¶¶ 21-24, 36-41.)  As defendants have

9  noted, however, and as discussed at oral argument, public

10 entities in California are not liable for injuries they or their

11 employees cause, whether through acts or omissions, except as

12 otherwise provided by statute.  Cal. Gov. Code § 815.  "[D]irect

13 tort liability of public entities must be based on a specific

14 statute declaring them to be liable, or at least creating some

15 specific duty of care . . . ."  Eastburn v. Reg'l Fire Prot.

16 Auth., 31 Cal. 4th 1175, 1183 (2003).  "Otherwise, the general

17 rule of immunity for public entities would be largely eroded by

18 the routine application of general tort principles."  Id.

19 (citations omitted).  Because neither plaintiffs nor the court

20 have identified a California statute providing for liability

21 against the County or the Sheriff's Office under these

22 circumstances, summary judgment will be granted for these

23 defendants on plaintiffs' negligence claims.

24         On the other hand, defendants have identified no

25 statutory basis on which to bar plaintiffs' negligence claims as

26 against the individual defendants.  Whether a defendant is

27 negligent under California law is ordinarily a question of fact.

28 Peri v. L.A. Junction Ry., 22 Cal. 2d 111, 120 (1943); Huang v.

1  <u>The Bicycle Casino, Inc.</u>, 4 Cal. App. 5th 329, 344 (2d Dist.

2  2016) (breach of duty and causation are issues for trier of fact)

3  (citations omitted); <u>Nichols v. Keller</u>, 15 Cal. App. 4th 1672,

4  1687 (5th Dist. 1993) ("Like breach of duty, causation also is

5  ordinarily a question of fact which cannot be resolved by summary

6  judgment.").  Here, as the court explained at oral argument,

7  plaintiffs' claims for negligence against the individual

8  defendants are highly fact-bound, making adjudication of those

9  claims inappropriate on summary judgment.  Given the factual

10 issues present in this case, summary judgment on these claims

11 will be denied.

12       IT IS THEREFORE ORDERED that defendants' motion for

13 summary judgment (Docket No. 29-1) be, and the same hereby is,

14 GRANTED on plaintiffs' federal claims under § 1983.

15       IT IS FURTHER ORDERED that defendants' motion be, and

16 the same hereby is, GRANTED on plaintiffs' claims for negligence

17 as against defendants Butte County and Butte County Sheriff's

18 Office, and DENIED in all other respects.[6]

19 Dated:  April 21, 2022

20  WILLIAM B. SHUBB
21  UNITED STATES DISTRICT JUDGE

22

23

24

25

26 _____
       [6]    Because the court does not rely on the contents of the
27 documents attached to defendants' request for judicial notice
   (Docket No. 29-25) in deciding this motion, the request is DENIED
28 AS MOOT.