PETER G. WASHINGTON, Bar No. 230514
**LOW McKINLEY & SALENKO, LLP**
1600 Humboldt Road, Suite 2
Chico, California 95928
Telephone: (530) 345-0821
Facsimile: (530) 342-2242
Email: pgw@lmblaw.net

BRAD J. STEPHENS, State Bar No. 212246
**BUTTE COUNTY COUNSEL**
25 County Center Drive, Suite 213
Oroville, California 95965
Telephone: (530) 538-7621

Attorneys for Defendants COUNTY OF BUTTE, BUTTE COUNTY SHERIFF'S OFFICE and ESTEBAN PEREZ

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE BEAVER and JOSEPH STILWELL,<br><br>   Plaintiffs,<br><br>   vs.<br><br>COUNTY OF BUTTE, et al.,<br><br>   Defendants. | CASE NO.: 2:20-cv-00279-WBS-DB<br><br>**TRIAL BRIEF** |

### INTRODUCTION

Plaintiffs have sued Defendant Esteban Perez, a correctional sheriff's deputy and his employers the Butte County Sheriff's Office (BCSO) and the County of Butte, for negligence. They contend that Deputy Perez breached a duty to safeguard them in the early morning hours of March 7, 2019, when Mr. Beaver was assaulted by Antonio Hernandez and Mr. Stilwell was injured when he intervened in the fight. Beaver, Stilwell and Hernandez were all inmates living in the same housing unit.

Summary judgment was granted in favor of the Defendants as to claims asserted under 42 U.S.C. § 1983 for alleged deliberate indifference. Plaintiffs have also dismissed claims against the

jail's medical providers based on any allegedly inadequate medical response. As the Court is aware from the pretrial conference, Plaintiffs have abandoned previously stated claims based on negligent hiring, retention, training and supervision, claims based on negligence in the classification and housing decisions relating to Hernandez and/or the Plaintiffs, and claims asserted against the Sheriff himself, a sergeant, and another deputy originally named in the lawsuit. The sole claim remaining for trial is that Defendant Perez was negligent in the performance of his duties at the time of the incident, and that the entity defendants are vicariously liable for his conduct.

Plaintiffs seek noneconomic damages for pain and suffering only. Defendants do not contest the applicability of vicarious liability but deny that Deputy Perez was negligent and deny that his conduct, whether or not it met the standard of care, was a legal cause of plaintiffs' injuries.

## STATEMENT OF FACTS

### A. Plaintiffs' Incarceration and the Assault

In early 2019, Plaintiffs Clarence Beaver and Joseph Stilwell were inmates at the Butte County Jail, housed in G Pod. G Pod is a dormitory-style housing unit with a 40-person capacity in which the sleeping arrangements consist of 20 two-inmate bunk beds divided between two floors. The unit houses inmates who classify as requiring medium security, protective custody housing.

Inmate Antonio Hernandez was booked into jail on February 6, 2019. After spending close to three weeks under observation based on mental health concerns pursuant to the jail's Suicide Prevention Protocol, he was placed in G Pod on February 25, 2019. Though Beaver and Stilwell both felt that Hernandez's behavior was indicative of "some type of issue" or "that something was wrong with his psyche," neither recalls Hernandez threatening them or any other inmate prior to the assault, for which no motive is apparently known. Beaver testified that in the roughly ten days between his arrival and the assault Hernandez did not threaten Beaver or any other inmate, and was not involved in any physical altercations. Stilwell believes he may have told a correctional officer at some point something to the effect of "'[t]his guy is over here talking to himself and talking about hurting people, you need to do something about it,'" but could not recall any specifics such as what officer he told or when. Stilwell described hearing Hernandez muttering to himself, including statements such as "'I'll

kill this dude'" or "'I'll kill that guy'" but he never heard a threat about a specific person and did not ever see Hernandez threaten someone directly.

Hernandez's classification file does not contain any reports of violence or threats prior to the assault, and numerous correctional officers have testified that they were not aware of any concerns about threatening or violent behavior by Hernandez until the assault that gave rise to this lawsuit.

On the night shift that included the early morning hours of March 7, 2019, defendant Esteban Perez was assigned to Post 22, which is the observation and control tower for the housing units on the Delta Floor, including G Pod. Just before 3:00 a.m. he noticed Antonio Hernandez walking in the day room of G Pod. Specifically, he saw Hernandez in the day room, near the television mounted on the wall on the left side of the pod from his perspective from the tower, walking toward the bunk area. This did not arouse undue suspicion – Deputy Perez testified:

> We have inmates that go in the day room throughout the night because they forgot their cup, you know, they like to drink water out of, coffee. They forget their food on the table, so they come out and grab it. There's numerous reasons why they come out. Their towel, their sweatshirt that they forget in the day room. They come out, they grab it, and then they walk back to their bedding area.

Deputy Perez contrasted this with examples of activities that would have aroused suspicion: walking around, sitting or standing or loitering, which would typically cause him to communicate with the inmate over the intercom. He stated that "[i]f they're just walking around, ... I usually get on speaker and tell them to get back on their racks." He testified that "[Hernandez] was not walking around. ... [He was] walking towards the bunk area."

Perez was observing the housing unit directly through glass rather than viewing a live video feed on a monitor. To switch to the camera feed would have required diverting his attention away from Hernandez to navigate through approximately three menus or submenus on a touchscreen control panel. Because it was nighttime, his direct view of Hernandez was darker than it appears on the video. He did not see anything in Hernandez's hand at that time (though on later viewing the video he could see Hernandez was carrying "[s]omething white.")

Hernandez then entered the bunk area, which was darker than the day room causing Perez to lose visual contact with him for a short while. Perez then noticed a "scuffling of individuals,"

TRIAL BRIEF 3

whereupon he turned on the lights in the housing unit. At this point Perez observed a physical altercation, and within a few seconds he called over the radio that there was a "415 in G Pod." About 30 seconds later, officers responded and entered the housing unit.

Immediately prior to making these observations, Deputy Perez had been scanning a piece of outgoing inmate mail, which is a regular part of the duties of the officer assigned to Post 22 for the night shift. To ensure that he maintains good observation of the housing units while scanning mail, Deputy Perez explained that he will look up and look through every housing unit after completing a review of each letter, and in the case of longer letters, he will take breaks in the middle to scan the housing units. Deputy Perez has testified that after initially taking note of Hernandez walking in the day room, he did not take his focus away from Hernandez until after the conclusion of the incident although he did lose clear visual contact for a time due to the darkness of the bunk area.

Sergeant Jason Behlke and seven correctional deputies responded to G Pod in response to Deputy Perez's radio call. They observed Mr. Stilwell lying on the ground bleeding, and he stated that Hernandez had tried to bite him. Beaver was sitting on his bunk holding a sheet on his face, which was bleeding. Beaver stated Hernandez had assaulted him while he was sleeping. Hernandez's demeanor was consistent with having been involved in the altercation and he was quickly restrained. Within a few minutes, two nurses from the medical unit assessed the Plaintiffs' injuries and decided to have them sent to Oroville Hospital for medical treatment. After photographs of the injuries were taken, Stilwell and Beaver were transported to the hospital at approximately 3:20 a.m.

Subsequent investigation, including review of video surveillance footage, revealed that Hernandez assaulted Beaver with a push broom head he had removed from its handle shortly before Deputy Perez took notice of him walking back toward the bunk area. G Pod is outfitted with cleaning supplies for the inmates, who are responsible for keeping their living area clean, to use including cleaning and disinfecting solutions, a mop bucket, a shower brush, a push broom head and a handle that is switched back and forth between the broom head and shower brush. The mop bucket and disinfectant bottles are taken out once per shift to be refilled, but the cleaning supplies are otherwise always in the pod.

TRIAL BRIEF 4

The observation and control tower (Post 22) is staffed at all times, twenty-four hours a day, seven days a week.  There is an intercom system over which inmates and the tower officer can communicate in emergency situations.  Floor officers also conduct walk-throughs of each pod, every 60 minutes at least, to check on the wellbeing of inmates.  On the night shift for March 6-7, 2019, these checks were made by the Delta floor officer, Deputy Yee, at least every 55 minutes beginning at 7:15 p.m.

B.   **Plaintiffs' Injuries and Alleged Damages**

Damages in this case have been limited to general damages for pain and suffering.  Plaintiffs are not seeking any economic damages, attorney's fees or punitive damages.

Mr. Beaver suffered a facial fracture but did not require surgery.  He was released not long after the incident and returned home where he went back to work in a physically demanding job.  He claims some residual discomfort due to nerve damage, but has not needed significant medical care and it does not seem to have any significant impact on his ability to work and live a normal lifestyle.

As for Mr. Stilwell, he had more significant injuries including a fractured patella and a larger laceration to the head.  He has been hospitalized and also received medical care in the correctional setting, including surgery and physical therapy.  His condition appears to be stable at this time.

## POINTS OF LAW

A.   **General Principles of California Negligence Claims and Public Employee Liability**

Plaintiffs' claims are for negligence under California law.  The elements of such a claim are "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury."  *Ladd v. County of San Mateo*, 12 Cal.4th 913, 917 (1996).  Defendants acknowledge that the Plaintiff may allege a duty to prevent harm by virtue of the special relationship between jailer and inmate.  See *Giraldo v. Department of Corrections & Rehabilitation*, 168 Cal.App.4th 231, 246-253 (2008).  The elements of breach, causation and harm will be for the jury.

Pursuant to California Government Code section 815, the entity liabilities are not directly subject to common-law negligence liability.  Specific statutory liability must be established.  *Eastburn v. Regional Fire Protection Authority*, 31 Cal.4th 1175, 1183 (2003).  Plaintiff must cite to a precise

TRIAL BRIEF                                                                                                                            5

statute that forms the basis of his claim. "Since the duty of a governmental agency can only be created by statute or 'enactment,' the statute or 'enactment' claimed to establish the duty must at the very least be identified." *Searcy v. Hemet Unified School Dist.*, 177 Cal.App.3d 792, 802 (1986).

A public employee is liable in tort to the same extent as a private person. Cal. Govt. Code § 820(a); *Lugtu v. California Highway Patrol*, 26 Cal.4th 703, 715 (2001). A public entity may be vicariously (but not directly) liable for the torts of its employees under the doctrine of respondeat superior. Cal. Govt. Code § 815.2(a); *C.A. v. William S. Hart Union High Sch. Dist.* 53 Cal. 4th 861 (2012).

### B. Comparative Fault

California Civil Code section 1431.2(a) provides:

> In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount.

Section 1431.2 was enacted in 1986 through a ballot initiative titled the Fair Responsibility Act of 1986, popularly known and commonly referred to as Proposition 51. *Weidenfeller v. Star & Garter*, 1 Cal.App.4th 1, 4, fn. 3 (Cal. App. 4th Dist. 1991). In applying the comparative fault principles set out in Proposition 51, juries are instructed to consider the fault of any persons or entities legally responsible for the harm, including not just co-defendants but also the plaintiff and nonparty tortfeasors. *Vollaro v. Lispi*, 224 Cal.App.4th 93, 99-100 (Cal. App. 2d Dist. 2014); *DaFonte v. Up-Right, Inc.*, 2 Cal.4th 593, 600 (1992). "In short, under Proposition 51, an injured plaintiff bears the entire risk of loss for any unpaid noneconomic damages attributable to a tortfeasor who has not been sued or is statutorily immune." *Vollaro, supra*, 224 Cal.App.4th at p. 100, citing *Mendoza v. Club Car, Inc.*, 81 Cal.App.4th 287, 305 (Cal. App. 4th Dist. 2000).

In applying the principles of section 1431.2, "fault" is not limited to negligence. *Weidenfeller, supra*, established that an action in which one tortfeasor acted negligently and another acted intentionally is "an action based upon principles of comparative fault." *Scott v. County of Los Angeles*, 27 Cal.App.4th 125, 149-150.

> It follows that in *all* cases in which a negligent actor and one or more others jointly caused the plaintiff's injury, the jury should be instructed that, assuming 100 percent represents the *total causes* of the plaintiff's injury, liability must be apportioned to each actor who caused the harm in direct proportion to *such actor's respective fault*, whether each acted intentionally or negligently or was strictly liable [citation], and whether or not each actor is a defendant in the lawsuit [citation].

*Id.* at p. 151 (italics in original).

The Ninth Circuit has held that *Weidenfeller* should be followed by Federal District Courts applying California law. *Martin v. United States*, 984 F.2d 1033, 1039-1040 (9th Cir. 1993). The Fifth Circuit has also cited *Weidenfeller* for the proposition that California law allows for "apportionment of fault between a negligent defendant and an intentional tortfeasor." *Whitehead v. Food Max, Inc.*, 163 F.3d 265, 281 (5th Cir. 1998). And while a recent California Supreme Court decision held that for policy reasons expressed in statute an intentional tortfeasor may not benefit from Proposition 51 by shifting liability to another actor who was merely negligent, the Court in that case cited *Weidenfeller* approvingly and expressly declined to "express [an] opinion on whether negligent tortfeasors may, under section 1431.2, subdivision (a), obtain a reduction in their liability for noneconomic damages based on the extent to which an intentional tortfeasor contributed to the injured party's injuries." *B.B. v. County of Los Angeles*, 10 Cal.5th 1, 29, fn. 4 (2020).

In light of all of the foregoing, the jury should be instructed on the elements of battery as they relate to Mr. Hernandez's conduct, and to include Mr. Hernandez's conduct in its apportionment of fault for the plaintiffs' injuries.

## MOTIONS IN LIMINE

Defendants raise the following issues for the Court to consider *in limine*.

### 1. No Evidence or Argument Concerning Abandoned Claims or Theories

Evidence that is only relevant to claims or theories of liability that the Plaintiffs have expressly abandoned, or that is primarily relevant to such claims and of only minimal relevance to the remaining issues, should be excluded. Federal Rules of Evidence (FRE) 402, 403. In particular, at various points in discovery and in opposition to Defendants' Motion for Summary Judgment, Plaintiffs have pointed to a letter sent by previously named Defendant Sheriff Kory Honea to the Butte County Board of Supervisors dated July 27, 2015, in which he solicited the Board's support in the Sheriff's Office's

TRIAL BRIEF                                                                                                               7

efforts to obtain funding to build a new jail facility.  Plaintiffs have cited this letter as evidence that the existing jail facility had an overcrowding problem which may have influenced classification and housing decisions regarding Mr. Hernandez.  See, e.g., The Plaintiffs having abandoned their claims based on mis-classification, the July 27, 2015 letter has no relevance nor would any evidence concerning Mr. Hernandez's classification history.  Plaintiffs should likewise be precluded from introducing evidence about any alleged deficiencies in the medical response to their injuries, or in the training of BCSO personnel.  And summary judgment having been granted on the Civil Rights Act claims, the Plaintiffs should be admonished not to testify or argue that they felt their constitutional rights were violated.  Finally, because they have decided not to seek recovery of economic damages, Plaintiffs should be precluded from introducing evidence concerning any medical expenses or lost wages.

### 2. No Mention of Liability Insurance or Other Fund Pooling Arrangements

Defendants hereby move that Plaintiff's counsel be precluded from questioning witnesses, mentioning to prospective jurors, arguing, or otherwise mentioning the existence of liability insurance or any joint powers agreement and pooling of funds for liability purposes.

The prohibition of any mention of insurance at trial is a longstanding and well established legal proposition. *See CACI 105; Witkin*, California Trial Procedure (3rd Ed.), §217-268; *see also* FRE 411. Joint powers pooling agreements between public entities are to be treated as liability insurance. *Government Employee's Company, Inc. v. Gibraltar Casualty Company,* 184 Cal.App.3d 163 (1986).

### 3. No Evidence Concerning Deputy Perez Having Seen Mr. Hernandez Earlier or Observed His Activities in More Detail

Both Mr. Stilwell and Mr. Beaver submitted Inmate Grievance Forms in connection with the incident in which they asserted or implied that Deputy Perez had seen Mr. Hernandez's activities in the dayroom prior to the incident more fully than he has testified.  Questioning at deposition made clear that these statements lacked appropriate foundation and were based on speculation and/or multiple layers of hearsay.

...

...

Stillwell wrote in his grievance, in part:

> Deputies I spoke with who saw the video, including the tower deputy said [Mr. Hernandez] was viewed wandering around the dayroom well before the incident occurred, He never should have been allowed to do so …

Mr. Stilwell was questioned about this at his deposition at which time he was asked the following questions and gave the following answers:

> Q.   Okay.  But I just want to be clear, Deputy Perez did not tell you that while he was up in the tower he directly observed Hernandez doing – out in the dayroom, did he?
>
> A.   I don't remember him addressing me, personally, and telling me that, no.
>     . . .
>
> Q.   Well, so when you said – you say in your grievance form, "Deputies I spoke with who saw the video, including the tower deputy."
>     Did you actually have a direct conversation with Deputy Perez at some point?
>
> A.   You know what, I don't think that I spoke with him directly, but he was the acting tower CO at that time, so those guys are obviously the ones who see the video and can see for themselves what happened.
>     . . .
>
> Q.   That's fine.  What I'm looking at is before that response, right, your initial grievance, and what you wrote. And you say, "Deputies I spoke with."
>
>     Was there deputies you spoke with before writing the grievance?
>
> A.   I don't remember, to be honest with you.

Stilwell deposition, p. 42, ln. 11 through p. 43, ln. 12 (with omissions).

Meanwhile Beaver wrote in his grievance form:

> Deputy Perez stated he saw inmate Antonio Hernandez in Bunk 20B was in fact walking around in the Day Room with the broom end but failed to act on what he was doing with his abnormal behavior.

...

...

...

TRIAL BRIEF                                                                                          9

Mr. Beaver was questioned about this at his deposition at which time he was asked the following questions and gave the following answers:

> Q. Do you remember writing that?
>
> A. It sounds familiar.
>
> Q. Okay. Can you remember this conversation that you apparently had with Deputy Perez?
>
> A. No, I don't recall it.
> . . .
>
> Q. Okay. Im just trying to see if you remember anything about what prompted you to write a statement essentially summarizing what Deputy Perez apparently –
>
> A. Well, one of the inmates there at the pod, they told me that after – you know, after the incident. I came back and they noticed that and they said, you know, you probably want to document that and write that up so the guys know that, yeah, he was doing something with that situation and they didn't take it upon themselves to – you know.
>
> Q. Okay. So a different inmate told you that Perez had said this?
>
> A. Yes.

Beaver deposition, p. 42, ln. 9 through p. 43, ln. 8 (with omissions).

It is apparent the statements attributed to Deputy Perez in both Plaintiffs' grievance forms lack foundation or are hearsay within hearsay. Neither Plaintiff could testify that Deputy Perez had actually told them (or anyone) anything about having observed Hernandez carrying the broom head or "wandering around" in the dayroom. Instead, it appears the statements in the grievance form were made with the benefit of hindsight including the fact that at least some deputies had subsequently watched the video, and may have been informed by gossip from other, unidentified inmates. The grievance forms themselves should not be admitted, nor should Plaintiffs be permitted to elicit testimony consistent with those statements.

...

...

...

TRIAL BRIEF                                                                                                                         10

Should any witness intend to so testify, the Court should require Plaintiffs to provide an offer of proof, and should hold a hearing outside the jury's presence to determine the reliability and admissibility of any such evidence.

Dated:  January 17, 2023          **LOW McKINLEY & SALENKO, LLP**

 /**s**/Peter G. Washington
PETER G. WASHINGTON
Attorneys for Defendants
COUNTY OF BUTTE, BUTTE COUNTY
SHERIFF'S OFFICE and ESTEBAN PEREZ